836 P.2d 673 (1992)
John Paul WASHINGTON, Appellant,
v.
STATE of Oklahoma, Appellee.
No. F-84-727.
Court of Criminal Appeals of Oklahoma.
June 29, 1992.
Terry J. Hull, Asst. Public Defender, Norman, for appellant.
Michael C. Turpen, Atty. Gen., Jean M. LaBlanc, Asst. Atty. Gen., Oklahoma City, for appellee.

OPINION
BRETT, Judge:
John Paul Washington, appellant, was tried by a jury for the crimes of First *674 Degree Murder (Count I), in violation of 21 O.S. 1981, § 701.7, and First Degree Rape (Count II), in violation of 21 O.S. 1981, §§ 1111 and 1114, in Case No. CRF-84-795, in the District Court of Oklahoma County. The jury returned a verdict of guilty on both Counts and assessed punishment at death on Count I and five hundred (500) years imprisonment on Count II. The trial court sentenced the appellant accordingly. It is from this Judgment and Sentence that appellant has perfected his appeal to this Court.
On the afternoon of February 12, 1984, Arlie Virgil Newsome and his wife Bobbette were in the parking lot of their apartment complex looking at some minor damage to their car. The appellant, who lived in the same complex, approached them and offered to repair the car if they had the necessary screws. They did not have the screws but said that they would get some and then notify the appellant. The Newsomes then went into their apartment and the appellant left. A few minutes later, the appellant appeared at the Newsomes's door with screws in hand. Mr. Newsome and the appellant went out to the car for a while and then came back in to drink some iced tea. After appellant asked Mr. Newsome to take him to the store to buy cigarettes, the two left the apartment together.
Approximately twenty minutes later, appellant knocked on the apartment door. Mrs. Newsome answered the door and asked where her husband was. Appellant said that he was right behind him. He then entered the apartment and locked the door. Appellant raped Mrs. Newsome four times before he tied her up and left. Mr. Newsome's body was later found near a trash dumpster at the apartment complex. The appellant was arrested that same night.
Because we find that this case must be reversed, we will address only the error which requires this result. After preliminary hearing but prior to trial, defense counsel made a motion before the trial court requesting, in pertinent part, that appellant be provided funds with which to secure a psychiatrist, forensic odontologist and chemist. The trial court originally granted this motion but rescinded its order four days later finding that the requested experts need not be appointed because there was no constitutionally mandated duty to do so. Thus, appellant proceeded to trial without the aid of the requested experts and was duly convicted of the crimes charged.
There was a significant change in federal constitutional law regarding the need to provide expert witnesses to indigent defendants in 1985, after appellant's conviction. In Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985), the Supreme Court found, upon a federal constitutional basis, that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is likely to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." The Supreme Court instructed that this holding be applicable not only to the guilt/innocence stage of the proceeding, but also to the punishment stage of the proceeding when "the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer... ." Id., 470 U.S. at 80, 105 S.Ct. at 1095. Later, in Ake v. State, 778 P.2d 460, 464 n. 1 (Okl.Cr. 1989), this Court noted that the ruling enunciated by the Supreme Court in Ake v. Oklahoma dealt specifically with psychiatric experts, but did not preclude the possibility that the principles of Ake should be extended to include any expert which is "necessary for an adequate defense."
To decide whether the State shall be required to provide an indigent defendant with expert assistance under Ake v. Oklahoma the Supreme Court employed a three part analysis. First, it was noted that "[t]he interest of the individual in the outcome of the State's effort to overcome the presumption of innocence" weighs heavily in the analysis. Ake v. Oklahoma, 470 U.S. at 78, 105 S.Ct. at 1093. Second, the interest of the State was weighed. Id. Finally, the Court inquired "into the probable *675 value of the [expert] assistance sought, and the risk of error in the proceeding if such assistance is not offered." Id., 470 U.S. at 79, 105 S.Ct. at 1094.
After Ake had been handed down, defense counsel in the present case requested that this Court grant appellant an evidentiary hearing to allow him the opportunity to present what he could have shown in support of his motion for experts had the parties had the benefit of the Ake ruling at the time that the original motion was argued. This request was granted, an evidentiary hearing was had, and findings of fact and conclusions of law were entered and forwarded to this Court.
In regard to appellant's request for a psychiatric expert, the hearing judge first noted in his findings of fact that appellant was charged with malice aforethought murder, which put his specific mental state at issue. He also noted that a bill of particulars was filed wherein it was alleged that appellant constituted a continuing threat to society. Because of this, appellant's mental condition was also relevant to the punishment imposed.
At the evidentiary hearing, evidence presented showed that the attorney who represented appellant at preliminary hearing had requested a psychiatric expert for several reasons. These reasons include the facts and circumstances surrounding the crime, his suspicion that appellant may have been on drugs, namely PCP, when the crime was committed, and because he had gathered information from appellant's family indicating that appellant had a learning disability, was depressed before the crime, and had suffered head trauma as a child. Further, at the time of the original motion hearing, evidence of appellant's history could have been presented from appellant's sister. Evidence presented at the evidentiary hearing showed that his sister could have testified that appellant seemed "mentally off" and suffered from a learning disability. She also indicated that after a head injury as a child, appellant became even slower and began having behavioral problems at school. Appellant became easily agitated and would not be able to control his temper. Appellant's sister also revealed that a few weeks before the homicide appellant had stated that the police were going to "get him." After his incarceration while he was awaiting trial, appellant told his sister that he had been framed by the police. His sister thought at this time that he was suffering from mental problems.
Evidence was also presented at the evidentiary hearing that appellant's second defense attorney had questioned appellant's mental condition at the time that the crimes were committed. Apparently, appellant was unable to communicate to his attorney in any manner any information to help him prepare appellant's defense. Appellant did not seem to understand the reality of the situation and was obsessed with the belief that he had been framed by the police. On occasion, appellant would talk gibberish and his attorney would not be able to understand what appellant was saying. Although it was not known to appellant's attorney at the time, appellant was administered antipsychotic medication while in jail prior to trial. Appellant's distorted perception of the events of the crime, his inability to talk about them and his need for antipsychotic medication could have raised serious questions concerning his mental condition at the time that the crime was committed. Of course, this information could not have been presented at the original motion hearing argued by appellant's first attorney. However, if Ake had been decided prior to the time that appellant's second attorney took over the defense, he could have reargued the motion for psychiatric assistance and imparted this information to the trial court.
Much evidence was presented at the evidentiary hearing concerning appellant's present mental condition. This evidence showed that since his conviction appellant has been committed to a state mental institution several times. He has suffered recurrent somatic ailments and experiences bizarre delusions. Since his incarceration, appellant has on numerous occasions been diagnosed as suffering from schizophrenia, paranoid type, chronic, and sometimes with *676 acute exacerbation. In the findings of fact and conclusions of law, the hearing judge stated that the pertinence of this information is that it suggests the state of appellant's mental condition at the time that the motion for the assistance of a psychiatrist was made. However, this finding is inconsequential. The only evidence of relevance at the evidentiary hearing was that which the defense attorney could have presented to the trial court in the motion hearing. Because this evidence clearly could not have been presented at that time, in fact it could not have been discovered without the aid of a psychiatrist, it should have had no bearing on the evidentiary hearing.
Notwithstanding that we do not find appellant's mental condition since the time of trial to be relevant to the evidentiary hearing, we do find that the other evidence offered, which could have been presented in support of the motion for assistance of a psychiatrist prior to and at the time of trial, was more than adequate to support the hearing judge's conclusion that defense counsel could have made the requisite showing under Ake to warrant the assistance of a psychiatrist at State expense.
At the evidentiary hearing there was evidence that defense counsel's original request for the assistance of a forensic odontologist was based upon evidence that a bitemark had been found on the homicide victim and the State, at preliminary hearing, had presented the testimony of an "expert forensic odontologist" to identify the appellant as the perpetrator of the bitemark. Although not presented at preliminary hearing, there was also evidence that the State would offer at trial the testimony of an expert chemist to identify appellant as the perpetrator of the crimes through analysis on hair, blood, fiber and serological evidence found at the scene of the crimes and taken from the appellant and the victims. It appears from the findings of fact and conclusions of law, that defense counsel's request for the assistance of these two experts was based upon the need to rebut the testimony of these witnesses at trial and try to find inconsistencies in their testimony. The defense also voiced a concern that these expert witnesses were needed because the State would rely extensively on the testimony of its own experts at trial in order to make the case against the appellant.
While the preliminary hearing transcript and the chemist's forensic report did indicate that the bitemark evidence and the chemical analysis would make up part of the State's case against the appellant, the transcript also indicates that this expert testimony was only a part of the vast whole of the evidence to be presented in the State's case-in-chief. A review of the preliminary hearing transcript reveals that in addition to the chemist's report and the bitemark testimony, appellant was inculpated by other evidence as well. For instance, at preliminary hearing Mrs. Newsome identified appellant not only as the person who repeatedly raped her, but also as the person with whom she last saw her husband alive. She also testified that while appellant was raping her, she asked him where her husband was and appellant on one occasion replied that her husband was in a dumpster. The police testified that her husband was found dead by a dumpster. Mrs. Newsome identified a photograph of a broken watch as that of her husband's, which he was wearing the day he was killed. According to police testimony, this photograph was taken of a watch found in appellant's apartment. Finally, a wallet and some identification belonging to the deceased were found on the appellant's person when he was booked into custody at the police station.
This additional evidence, which was virtually ignored at the evidentiary hearing and seemingly not taken into consideration in the judge's findings of fact and conclusions of law is important to the determination of the importance of the requested experts to the appellant's defense. When the evidence presented at the preliminary hearing is viewed in its entirety, we cannot agree with the finding of the hearing judge that the appointment of these two experts was necessary for appellant to prepare an adequate defense. The evidence presented at the evidentiary hearing, which could have been presented in the original motion *677 hearing, does not support a finding that the probable value of the forensic odontologist and the chemist to the appellant's defense was high. Nor does there appear to be a great risk of error in the proceeding if the expert assistance sought is not extended, as was required in Ake v. Oklahoma, 470 U.S. at 79, 105 S.Ct. at 1094.
In light of the foregoing discussion, we agree with the hearing judge and find that appellant could have made, at the motion hearing, the requisite showing under Ake v. Oklahoma to entitle him to the assistance of a psychiatric expert at State expense. However, we find that he did not make a sufficient showing at the evidentiary hearing to entitle him to the additional experts requested. Thus, the denial of appellant's request for a psychiatric expert deprived him of his fourteenth amendment constitutional right to due process. In light of the fact that appellant's mental condition was relevant to his criminal culpability and to the punishment imposed, we cannot find that his error was harmless.
The failure of the trial court to provide the appellant with the requested psychiatric assistance not only requires reversal of the murder conviction, it also requires reversal of appellant's rape conviction. The record reflects that defense counsel requested the assistance of a psychiatrist to assess the appellant's mental condition for a variety of reasons. This assistance was not sought only in regard to the intent element in malice aforethought murder or to provide mitigating evidence. The record reflects that this assistance was also sought to assess appellant's sanity at the time that the crimes were committed. The original Motion for Funds for Expert Witnesses alleged "a need to determine whether [the defendant] ha[d] the ability to distinguish right from wrong ... at the time he allegedly committed these particular acts." Further, the Findings of Fact and Conclusions of Law issued by the district court judge upon the evidentiary hearing stated, in addition to other reasons articulated, that defense counsel had requested the assistance of a psychiatrist because he believed that the defendant "suffered from some mental disease or defect that affected his ability to conform his conduct to the requirements of law, and that the appellant did not know right from wrong at the time the crimes were committed". Although no insanity defense was proffered forth at trial, the hearing judge found that part of the reason that defense counsel had requested the assistance of a psychiatrist, was because he possessed information which led him to believe that a psychiatric examination may have produced sufficient evidence for an insanity defense at trial.
Under Oklahoma law, "[a]n act committed by a person in a state of insanity cannot be punished as a public offense, nor can said person be tried, sentenced to punishment, or punished for a public offense while he is insane." 22 O.S. 1981, § 1161. Thus, just as appellant's request for psychiatric assistance to determine his sanity at the time of the commission of the offense went to the heart of the first degree murder charge, it also was relevant to the first degree rape charge.
Appellant's Judgments and sentences on both the First Degree Murder conviction and the First Degree Rape conviction are REVERSED and REMANDED for A NEW TRIAL.
LANE, P.J., concurs.
LUMPKIN, V.P.J., and PARKS, J., concur in part/dissent in part.
JOHNSON, J., joins in the vote of LUMPKIN, V.P.J.
LUMPKIN, Vice-Presiding Judge: concurring in part/dissenting in part.
Initially, I want to compliment the Honorable Charles L. Owens, District Judge, Oklahoma County, on the thorough and scholarly order entered on March 8, 1991. With the limited resources afforded to trial judges in the State of Oklahoma, his order reflects outstanding diligence in seeking to provide the analysis requested in our Order Remanding for an Evidentiary Hearing.
I concur in the Court's decision as it relates to the conviction of First Degree *678 Malice Aforethought Murder (Count I), however, I must dissent to the Court's decision regarding the First Degree Rape (Count II) conviction.
The Court has applied a broad brush application of Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), to both counts without analyzing the nature of the requests for expert assistance prior to trial or the application of those requests to the facts of the case. It must be recognized the Appellant did not raise sanity at the time of the offense as a defense in this case. In addition, the record is void of any preliminary showing regarding that issue prior to trial. The request for expert witnesses focused on defending against the charge of First Degree Malice Aforethought Murder both as to the ability of the Appellant to form the malice aforethought element of the offense and the identity evidence provided by the odontological expert and the chemist. Appellant also indicated a need for the psychiatrist as a mitigation witness during the penalty phase of trial. The basis of the pretrial request for experts must be the focal point for determining the effect of the denial of the expert assistance at trial, not what 20/20 hindsight might indicate would have been a better argument to raise. Due to the fact the issues raised prior to trial regarding the need for expert assistance related to the First Degree Malice Aforethought Murder conviction, and not the conviction for First Degree Rape, I would affirm the conviction in Count II.
I am authorized to state Judge JOHNSON joins in this opinion.
PARKS, Judge, concurring in part/dissenting in part:
I concur with the majority's decision to reverse both the murder and rape convictions on the basis of the trial court's failure to provide appellant with funds for a psychiatric expert. Furthermore, as this writer has repeatedly advocated, I agree with the majority that the ruling in Ake must necessarily extend to expert assistance, other than psychiatric, which is necessary for an adequate defense. See Ake v. State, 778 P.2d 460, 464 n. 1 (Okl.Cr. 1989); Williamson v. State, 812 P.2d 384, 415 (Okl. Cr. 1991) (Parks, J., specially concurring). I write separately only to voice my disagreement with the majority's conclusion regarding a forensic odontologist and a chemist. Rather, I concur in the trial court's conclusion that said experts were necessary for appellant to conduct an adequate defense.
Regarding the first expert, the State relied upon the testimony of a forensic odontologist to establish that appellant was the perpetrator of the bitemark found on the murder victim. The State's expert testified that he used two types of analyses to identify appellant as the assailant: bitemark/dentition comparison and a comparison of microorganisms found in the wound and in appellant's mouth. The doctor placed primary identification emphasis on the microorganism "aspergillus" being present in both the bitemark and in appellant's mouth. At trial, the doctor testified that aspergillus would be found in the mouths of only "one in a billion people." Although the doctor claimed that his tests were "accepted," he admitted that he was aware of no other persons who either used or advocated the use of microbiological analysis in bitemark comparisons. I agree with the trial court's conclusion that without an expert odontologist, the defense was unable to determine the reliability of the comparison techniques used by the State's expert or the accuracy of the conclusions he reached.
For similar reasons, I find that appellant should also have been granted funds to hire an independent expert chemist. Although the State's chemist did not testify at preliminary hearing, she testified at trial concerning her analyses of blood, hair and serological samples from the crime scene, the victims and appellant. Portions of her testimony were devoted to identifying appellant through a process known as genetic subtyping of body fluids by the use of electrophoresis. The use of electrophoresis to identify genetic markers in body fluids was a very new process at the time of appellant's trial. Without an independent expert, defense counsel was unable to test either the validity of the tests utilized or *679 the reliability of the results. An expert would also have been extremely beneficial in conducting an independent examination of the physical evidence used by the State's expert, especially in light of their expert's pretrial revelation that a Negroid pubic hair found on the sweatshirt of the deceased was inconsistent with appellant's pubic hair.
For the foregoing reasons, I find that appellant should have been granted funds to hire a forensic odontologist and a chemist, as well as a psychiatrist, and that these experts were necessary to defend against both the murder and the rape charges.