**Maximo Lee SALAZAR, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–88–569.**

Court of Criminal Appeals of Oklahoma.

April 29, 1993.

Rehearing Denied Aug. 30, 1993.

Barry Benefield, Oklahoma City, William H. Luker, Deputy Appellate Public Defender, Norman, for appellant.

Robert Schulte, Dist. Atty., Roy M. Calvert, Asst. Dist. Atty., Lawton, Robert H. Henry, Atty. Gen., A. Diane Hammons, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

CHAPEL, Judge:

Maximo Lee Salazar, appellant, was tried by jury and convicted of the crimes of First Degree Murder (21 O.S.Supp.1982, § 701.-7(A)) and First Degree Burglary (21 O.S. 1981, § 1431) in Comanche County District Court Case No. CRF–87–460. The jury set punishment on the burglary conviction at ten (10) years imprisonment. Following a second stage proceeding, the jury recommended appellant be put to death for the murder conviction. The trial court sentenced accordingly and appellant appeals.

During the early morning hours of August 24, 1987, nine (9) year old Jennifer Prill awoke to find appellant burglarizing her family's Cache, Oklahoma, residence. When appellant noticed Jennifer, he instructed her to return to her room. Appellant followed Jennifer to her bedroom and stabbed the child twice in the neck as she lay on her bed. Appellant then covered the child and fled the scene. Jennifer's body was discovered by her father later that morning. The medical examiner determined Jennifer bled to death as a result of a stab wound which severed her right jugular vein. It was determined that approximately eight dollars ($8.00) and a set of car keys had been stolen during the burglary.

At approximately 1:30 A.M. on August 29, 1987, Lawton police officers responded to a burglar alarm at Kelly's Corner convenience store. As the officers arrived at the scene, they observed a car leaving Kelly's Corner at a high rate of speed. The officers directed a spotlight into the driver's side of the vehicle and noticed two occupants. Officer LaFrance testified that the driver appeared to be an Hispanic male. After a high speed chase, the occupants abandoned the vehicle and escaped on foot. The car was impounded and inventoried. Among the items recovered from the vehicle were a blood-stained knife and the Prill's car keys. Papers discovered in the car, as well as a check of the VIN number, indicated that the abandoned vehicle belonged to appellant. At approximately 2:33 A.M. on that same morning, appellant telephoned police and reported his car stolen. The record reveals appellant is not Hispanic, but is American Indian.

Eric Bradbury testified he and appellant burglarized Kelly's Corner and then fled

from police. After separately eluding police, the two met and appellant phoned in the stolen car complaint. Bradbury stated appellant did not seem overly concerned about his car, but that he was "really paranoid about something that was in it." Appellant specifically mentioned a set of keys. Appellant was questioned by police on September 6 and 8, 1987. During the second interview and after acknowledging his *Miranda* rights, appellant confessed to the Prill burglary and the murder of Jennifer Prill.

The medical examiner opined the knife wounds on Jennifer Prill could have been made with the knife discovered in appellant's car. It was also determined the blood on the knife was consistent with the victim's blood type. Further expert testimony revealed three head hairs and one pubic hair recovered from the trauma pants placed on the victim during resuscitation efforts and at the crime scene were consistent with appellant's hair.

## I. ISSUES RELATING TO JURY SELECTION

■ Appellant asserts that the trial court erred by refusing to excuse prospective juror Cummins for cause. Appellant's primary complaint concerns Ms. Cummins response to a question posed by defense counsel during voir dire. The record reveals counsel asked Ms. Cummins whether she had "any sense that if you find Mr. Salazar guilty of this crime, that you owe it to someone, anyone, to find that he should receive the death penalty?" Ms. Cummins answered, "I think we'd owe it to the community." (Tr. 136–37). Appellant claims Ms. Cummins' response to this and two related questions demonstrated she felt obligated to impose the death penalty. We disagree.

A review of the entire transcript of voir dire proceedings reveals Ms. Cummins stated she had no strong feelings about the death penalty; she would have to hear all of the evidence before making a decision; she would give appellant the presumption of innocence; and she would follow the court's instructions. When Ms. Cummins'

responses are considered as a whole and in context, it is apparent she was not biased in favor of capital punishment. Accordingly, we find no abuse of the trial court's discretion in refusing to remove Ms. Cummins for cause. *See Smith v. State,* 727 P.2d 1366, 1370 (Okl.Cr.1986), *cert. denied,* 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987). Furthermore, as was true in *Boltz v. State,* 806 P.2d 1117, 1122 (Okl.Cr.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991), "even if error had been found, [Ms. Cummins] was excused by a peremptory challenge, and there is nothing in the record to show that any of the jurors who sat on the trial were objectionable."

■ In conjunction with the previous argument, appellant contends he was deprived of a fair trial by improper questions asked by the prosecutor during voir dire and the trial court's failure to timely place the prospective jurors under oath. We agree prosecutors should refrain from asking prospective jurors whether they could impose the death penalty "without doing violence to their conscience." *See Banks v. State,* 701 P.2d 418, 422 (Okl.Cr.1985). The proper inquiry is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). After considering all of the questions asked by the court, the prosecution and defense counsel, we find the correct standard was substantially satisfied.

■ Prior to voir dire, the trial court administered an oath to the initial twelve prospective jurors whereby the jurors swore they would truthfully answer all questions regarding their qualifications to serve as jurors. Following the sixth peremptory challenge, the court recognized it had inadvertently failed to administer such oath to any prospective juror after the initial twelve. Therefore, the court administered the oath to all the remaining venire. Without citing relevant authority, appellant argues this process, combined with the two errors alleged above, deprived him of a fair

trial. We have rejected the two previous arguments and now find that this proposition does not require reversal. While the administration of the above oath is appropriate, *see Oklahoma Uniform Jury Instructions—Criminal* (OUJI–CR) 101, we can locate no legal requirement that such be subscribed to by prospective jurors. Our statutes require only that members of a general jury panel subscribe to an oath regarding their qualifications to sit as jurors, 38 O.S.Supp.1985, § 20.1, and that jurors empaneled for a case swear that they will render a true verdict according to the evidence, 22 O.S.1981, § 601. This assignment of error is dismissed.

## II. ISSUES RELATING TO GUILT/INNOCENCE

During the late morning hours on September 6, 1987, appellant was questioned by three law enforcement officials after being advised of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and signing a form acknowledging he understood those rights. After approximately two and one half (2½) hours of questioning, two of the officers left the room while Lawton Police Detective Ronald Smith continued to question appellant off the record. Approximately fifteen (15) to twenty (20) minutes later, appellant confessed to the instant murder. The tape recorder was then turned back on and appellant's confession was recorded. A second confession was obtained on September 8, 1987, and both statements were transcribed. Following an *in camera* hearing in which the trial court found the statements were given voluntarily, the transcript of the initial confession was introduced in the first stage of trial. The transcript of the September 8th confession was introduced during the second stage. Advancing two separate arguments, appellant claims in his first assignment of error that his confessions should have been suppressed.

Appellant first asserts the confession of September 6, 1987, was "the product of coercive interrogation techniques practiced against a suspect of limited mental capabilities." [1] Essentially, appellant argues that his age and I.Q., combined with the interrogators' techniques and the attendant stress, rendered his confession inadmissible. The record reveals that appellant was nineteen (19) years old at the time of his confessions. Three experts testified during appellant's competency hearing on February 5, 1988, regarding his level of intelligence. Respectively, the experts opined appellant had an I.Q. of 65, 67 and something "in the lower 80's." [2] The State also adds that appellant finished the tenth grade, could read and write, completed Job Corp training, and passed his G.E.D. test.

■ While youth and limited mental capabilities are relevant to this inquiry, they are but factors to be considered in determining whether the confession was voluntarily given. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *Hayes v. State,* 738 P.2d 533, 537 (Okl.Cr.1987), *vacated on other grounds,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988).

The ultimate test of the voluntariness of a confession is whether it is the product of an essentially free and unconstrained choice by its maker. We must look to the totality of the surrounding circumstances, including the characteristics of the accused and the details of the interrogation.

*Castro v. State,* 745 P.2d 394, 403 (Okl.Cr. 1987), *cert. denied,* 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988). *See also Young v. State,* 670 P.2d 591, 594 (Okl.Cr. 1983). We have reviewed both the characteristics of appellant and the details of the interrogation and find the State met its burden of proving by a preponderance of the evidence that the confession was obtained voluntarily. *Hayes,* 738 P.2d at 537.

---

1. Appellant does not directly attack the September 8th confession, but claims it was the product of the first interrogation.

2. A fourth expert, who testified during the second stage of trial, opined that appellant's I.Q. was 81.

Among other items discovered in appellant's car was a .22 caliber pistol which had been recently stolen during a burglary of the Huddleston residence. During the September 6th interrogation, appellant was asked about several crimes, including the Huddleston burglary and the stolen pistol. Appellant repeatedly asserted he found the weapon by a trash can. When asked whether his possession of the gun logically linked him to the burglary, appellant responded, "No, don't want to even talk about the gun." The officers continued to question appellant and he later confessed to the instant crimes. As his second argument, appellant claims that his confession was obtained in violation of his constitutional right to remain silent because police continued to interrogate him after he allegedly attempted to exercise this right. We disagree.

■ The law is clear that a statement obtained from an accused after he has invoked his Fifth Amendment right to remain silent must be suppressed. *Miranda*, 384 U.S. at 473–74, 86 S.Ct. at 1627–28. However, we find that appellant did not invoke his rights in the present case. Read in context, the transcript of the confession reveals only that appellant did not desire to discuss further the .22 pistol stolen in an unrelated burglary. Accordingly, this assignment is dismissed.

As his second assignment of error, appellant contends he was denied effective assistance of counsel at trial. In support of this assertion, appellant argues counsel (1) failed to investigate and adequately utilize evidence of appellant's "mental retardation" to attack the admissibility of his confessions, (2) inadequately presented such evidence in the second stage, and (3) failed to introduce available evidence which would have corroborated appellant's trial testimony. Because we find the second stage proceedings must be reversed, *see* Part III of this Opinion, we shall consider only the first and third arguments set forth above.

"Appellate review of an ineffective assistance of counsel claim begins with a presumption of competence, and the burden is upon the defendant to demonstrate both a deficient performance and resulting prejudice." *Strickland v. Washington*, 466 U.S. 668, 687–89, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984). "If such a claim can be disposed of on the ground of lack of prejudice, an appellate court need not determine whether trial counsel's performance was deficient." *Id.* at 697, 104 S.Ct. at 2069.

■ As the State correctly asserts, it is not settled that appellant is "mentally retarded." Although two experts opined that appellant's I.Q. was in the mid to high 60's[3], two other experts testified his I.Q. was in the "low normal" range of intelligence. It should also be noted that mental retardation, in and of itself, does not preclude a defendant from voluntarily waiving his constitutional rights. *See Dunkins v. Thigpen*, 854 F.2d 394, 399 (11th Cir.1988), *cert. denied*, 489 U.S. 1059, 109 S.Ct. 1329, 103 L.Ed.2d 597 (1989). We have previously determined appellant's confession was given freely and voluntarily. We now find appellant has failed to prove the confessions would have been excluded had trial counsel presented evidence of the alleged mental retardation.

■ Regarding the third argument, appellant contended at trial that he had no memory of the events on the night of the murder. At the preceding competency hearing, one of the expert witnesses testified appellant was experiencing a psychological shutdown which might have caused him to suffer from memory lapse. Appellant now claims counsel was ineffective because he failed to present this evidence during the first stage of trial. Although such evidence may have corroborated appellant's testimony, we again conclude appellant has failed to demonstrate prejudice. In sum, we find appellant has failed to established that, but for counsel's alleged unprofessional conduct, the results of the

---

**3.** Under the definitions set forth in *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 442, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1985), an I.Q. in the mid to high 60's would indicate that a person is in the high end of the "mildly" retarded range.

trial would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

Appellant next asserts prosecutorial misconduct deprived him of a fair trial. We first note that a majority of the comments appellant cites as error were not objected to at trial. Therefore, they will be reviewed for fundamental error only. *Huntley v. State*, 750 P.2d 1134, 1136 (Okl.Cr. 1988). Fundamental error has been defined as that error which goes to the foundation of the case or which takes from the defendant a right essential to his defense. *West v. State*, 764 P.2d 528 (Okl.Cr.1988). We find no fundamental error. Of the comments which were objected to at trial, we find none was so egregious as to have determined the verdicts or affected the sentences. *See* 20 O.S.1981, § 3001.1. Reversal or modification is therefore unwarranted.

As his fourth assignment, appellant maintains he was denied due process of law when the trial court denied his requests for expert assistance and a continuance to analyze blood and hair evidence. At appellant's preliminary hearing on March 9 and 10, 1988, the State did not offer evidence of blood tests or hair comparisons. The State's blood test results were provided to defense counsel on May 17, 1988, and the following day appellant filed a motion for funds to hire an expert forensic chemist. Appellant alleged such assistance was necessary to rebut the State's blood test results and for other purposes. The results of the State's hair comparison evidence were turned over to the defense on or about May 25, 1988. A motion for continuance to secure expert assistance to analyze the evidence and test results was filed on June 8, 1988. Both motions were overruled and appellant's trial began on June 13, 1988.

 Pursuant to *Ake v. State*, 778 P.2d 460, 464 n. 1 (Okl.Cr.1989), an indigent defendant is entitled to any expert "necessary for an adequate defense." *See Washington v. State*, 836 P.2d 673 (Okl.Cr.1992). Before a defendant is entitled to such assistance, however, he must first make the requisite showing of need. *Ake*, 778 P.2d

at 464. He must also demonstrate on appeal that the lack of such assistance resulted in prejudice. *See Banks v. State*, 810 P.2d 1286, 1293 (Okl.Cr.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 883, 116 L.Ed.2d 787 (1992); *Woodard v. State*, 743 P.2d 662, 666 (Okl.Cr.1987) (Parks, J., concurring in part and dissenting in part). With respect to appellant's second motion, this Court has held that the decision whether to grant or deny a motion for continuance rests within the sound discretion of the trial court and will not be disturbed absent abuse of such discretion. *Ake*, 778 P.2d at 465.

 In the instant case, we find appellant has failed to demonstrate prejudice as a result of the trial court's actions. In addition to the blood and hair evidence, the State provided credible evidence in the form of appellant's confession and his possession of the Prill's car keys. Moreover, the evidence established that forty-five percent of the population have type "O" blood and the jury was repeatedly advised of the limitations of hair comparison techniques. We conclude appellant has failed to show that the trial court abused its discretion or that the court's actions undermined confidence in the outcome of his trial.

In his fifth assignment of error, appellant launches two attacks against the prosecution's hair evidence. He first claims the State's expert hair analyst improperly implied appellant had actual contact with the victim. Appellant also contends hair analysis is not sufficiently reliable and he urges this Court to reverse previous decisions which allow its admission.

 We initially disagree with appellant's characterization of the expert's testimony. Rather than "implying" appellant was at the scene of the crime, the expert gave her opinion that hairs discovered at the scene "were consistent" with appellant's hair. The expert testified both on direct and cross-examination that no person can be positively identified through current hair comparison techniques. She further explained this limitation was recognized by

the majority of experts in her profession. We also hold appellant has failed to prove the possible effect of the expert's testimony substantially outweighed its probative value. *See Phillips v. State,* 756 P.2d 604, 610 (Okl.Cr.1988), where this Court considered expert testimony substantially identical to that offered in the present case and found no reversible error.

Second, we are not persuaded by appellant's plea to abandon our long line of precedent and hold that hair comparison evidence is inherently unreliable. As this Court recently stated in *Williamson v. State,* 812 P.2d 384, 405 (Okl.Cr.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992), "We remain committed to our position as expressed in *Driskell v. State,* 659 P.2d 343, 356 (Okl.Cr.1983), which sanctioned the use of hair comparison evidence and the determination that any question about the procedures and conclusions drawn therefrom should be raised on cross-examination." This assignment of error is dismissed.

■ In his sixth assignment, appellant insists the trial court erred in allowing the State to introduce evidence of the Kelly's Corner burglary in the first stage of trial. He claims this other crime was in no way connected to the murder of Jennifer Prill and was more prejudicial than probative. We disagree.

Initially, we note the State properly filed a *Burks* notice prior to trial detailing the other crimes evidence which it intended to introduce, *see Burks v. State,* 594 P.2d 771 (Okl.Cr.1979), *overruled in part on other grounds, Jones v. State,* 772 P.2d 922 (Okl.Cr.1989), and the trial court submitted a comprehensive limiting instruction on other crimes evidence in the jury charge. In *Dunagan v. State,* 734 P.2d 291, 294 (Okl.Cr.1987), this Court reiterated that evidence of other crimes may be admissible where there is a "logical connection" with the offenses charged. "In the case at bar, the other offenses ... were the crimes which led to the appellant's apprehension and arrest and were properly admitted into evidence." *Id.*

We further find the evidence of the Kelly's Corner burglary and ensuing chase was properly admitted under 12 O.S.1981, § 2404(B), to prove "identity" and "knowledge." Two critical items of evidence, the blood-stained knife and Mr. Prill's car keys, were discovered in appellant's car after the car chase. Eric Bradbury testified he and appellant committed the robbery; appellant drove the getaway car; appellant appeared to be "really paranoid" about something left in the car; and appellant specifically mentioned a set of keys. The evidence discovered in appellant's vehicle tended to prove appellant's identity as the assailant in the present case. Bradbury's testimony tended to establish both that appellant was in possession of the knife and keys shortly before they were discovered and that appellant had knowledge of the crime. We find no abuse of the trial court's discretion in admitting this evidence. *See Ashinsky v. State,* 780 P.2d 201, 204 (Okl.Cr.1989).

■ Appellant next argues that reversible error occurred when a juror observed him in shackles. At the sentencing hearing, defense counsel informed the court that on the second day of trial a juror witnessed appellant being led from the courtroom in shackles. We find "[t]he brief fortuitous encounter outside the courtroom does not constitute reversible error, absent a showing of prejudice." *Childers v. State,* 764 P.2d 900, 903 (Okl. Cr.1988). *See also Owens v. State,* 654 P.2d 657, 659 (Okl.Cr.1982). Appellant has failed to demonstrate prejudice.

Finding no error warranting reversal of the judgments of guilt for either crime, appellant's convictions for First Degree Murder and First Degree Burglary are **AFFIRMED.** The sentence of ten (10) years imprisonment for First Degree Burglary, which was imposed following the first stage of trial, is also **AFFIRMED.**

### III. ISSUES RELATING TO PUNISHMENT

In his supplemental brief, appellant asserts that his right to due process and fundamental fairness were violated when the trial court failed to instruct the jury

that it had the option of imposing a sentence of life without the possibility of parole. We agree.

Prior to November 1, 1987, the punishment for First Degree Murder was life imprisonment or death. In 1987, §§ 701.9 and 701.10 of Title 21 were amended setting the range of punishment for the crime of First Degree Murder at life imprisonment, life imprisonment without the possibility of parole, and death. 21 O.S.Supp. 1987, §§ 701.9, 701.10. The life imprisonment without parole provision became effective November 1, 1987. Appellant committed the charged offenses on August 24, 1987, less than three months before the effective date of amended §§ 701.9 and 701.10. However, appellant's trial and conviction occurred in mid-June 1988, seven months after the effective date of these amended provisions.

■ Twice in the past two years, this Court has held that the amendment of the death penalty statute on November 1st, so as to include the punishment of life without parole, was a procedural change in the statute that did not constitute an imposition of punishment in an *ex post facto* manner. *Wade v. State*, 825 P.2d 1357 (Okl.Cr.1992); *Allen v. State*, 821 P.2d 371, 376 (Okl.Cr.1991).[4] *Wade* and *Allen* established that the procedural change in §§ 701.9 and 701.10 applies to all trials and convictions occurring after the effective date of the statutory change. Because appellant's trial and conviction occurred after amended §§ 701.9 and 701.10 went into effect, the jury should have been given the option of sentencing appellant to life without parole. *See also Dobbert v. Florida*, 432 U.S. 282, 293, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977) (defendant does not have right to be tried by all laws in effect at time crime was committed, and *ex post facto* does not " 'limit the legislative control of remedies and modes of procedure

which do not affect matters of substance' ") (citation omitted); *see also Williamson v. State*, 812 P.2d 384, 407 (Okl. Cr.1991).

The holdings of *Allen* and *Wade* are consistent with decades of Oklahoma law governing the application of procedural changes in criminal cases. The dissent's attack on this fairly straightforward application of the law is both curious and unjustified. In 1911, in *Ault v. State*, 5 Okl. Cr. 360, 115 P. 128 (1911), this Court made it very clear that procedural changes in the law, which do not prejudice or operate to the detriment of the defendant, apply to all trials occurring after the enactment of the statute. In *Ault*, the defendant committed a criminal offense on March 11, 1909. On June 11, 1909, the Oklahoma legislature enacted a procedural rule requiring that appeals from felony convictions must be perfected within six months after judgment is rendered. Shortly thereafter, on July 15, 1909, the defendant was tried and convicted of the charged offense. The defendant argued that since the rule governing the perfection of appeals was not in effect at the time he committed the charged offense, then that rule should not be applied to him. The Court heartily disagreed stating "[t]he statute requiring appeals relates only to procedure, and is not therefore *ex post facto*, and is applicable to and controls appeals in all cases where the trial occurred after the law went into effect." *Id.* 115 P. at 128. This rule is in accord with the basic rules of statutory construction. C.D. Sands, *Statutes and Statutory Construction*, § 42.06 (2d ed. 1973). *See also Winningham v. State*, 488 P.2d 609 (Okl.Cr. 1971) (a change in the rules governing joinder of criminal trials was procedural and therefore applied to all trials occurring after the effective date of the statute, even if the crime occurred before the enactment of

---

**4.** Although he has dissented in this case, Judge Lumpkin concurred in *Wade* and issued a separate opinion concurring in the result in *Allen*. Further, in *Allen*, this Court denied the State's petition for rehearing. In so ruling, this Court held that 22 O.S.1981, § 3 applied only to Title 22 and did not apply to 21 O.S.Supp.1987,

§ 701.10. The dissent appears to have resurrected the argument that 22 O.S.1981, § 3 somehow limits or constrains the application of amended § 701.10 to trials occurring after November 1, 1987. This argument has been clearly rejected and is plainly contrary to the rule of law as set forth by this Court in *Allen*.

the statute); *Paul v. State*, 483 P.2d 1176, 1178 (Okl.Cr.1971) (same).[5]

Despite this well-accepted rule governing the application of changes in procedural rules to a defendant's trial, the dissent cites several cases to support its apparent disenchantment with this basic rule of law. These cases are inapposite and should not be the basis for overturning *Allen* and *Wade*, or the decades old principle of statutory construction as set forth in *Ault*. For example, the dissent cites *Bowman v. State*, 789 P.2d 631 (Okl.Cr.1990), in which the Court concluded that it was not proper to sentence the defendant under a statute which went into effect after his trial and conviction. *Bowman* is plainly not relevant to appellant's case because the statutory change in §§ 701.9 and 701.10 went into effect *before* appellant's trial and conviction. Similarly, *Costa v. State*, 753 P.2d 393 (Okl.Cr.1988), is not applicable to the present case. The dissent notes that in *Costa*, this Court found that the trial court erred when it sentenced the defendant to life imprisonment without parole because that sentencing option was not available at the time of the commission of the crime. The dissent neglects to mention, however, that the life without parole option was not even a sentencing option at the time of the defendant's trial and conviction. The life without parole option did not go into effect until after Costa lodged his appeal with this Court. This Court has never suggest-ed that the life without parole option is applicable to cases where a defendant's trial and conviction occurred before the effective date of the amendment.

The dissent also notes that *Bowman* cites *Penn v. State*, 13 Okl.Cr. 367, 164 P. 992 (1917) and *Alberty v. State*, 10 Okl.Cr. 616, 140 P. 1025 (1914). *Penn* concerned the repeal of a statute that was in effect at the time the defendant was charged with an offense. *Alberty* addressed the effect of a change in the death penalty statute governing the method of execution on a defendant who was convicted and sentenced to death before the effective date of the statute. The *Alberty* Court noted that the statute applied to all convictions and sentences of death that were rendered subsequent to the effective date of the statute, and that it was only addressing cases that were on appeal when the statute went into effect. In both cases, the Court concluded that § 54 of Article V of the Oklahoma Constitution[6] allowed the prior law to be applied to the defendant's case. Penn was prosecuted under the repealed statute; and Alberty was to be executed in accordance with the old execution statute unless he requested that he be executed in accordance with the new statute. However, Article 5, § 54 does not apply to procedural changes in the law and has no bearing on the issues in appellant's case. *Ensley v. State*, 4 Okl.Cr. 49, 109 P. 250, 254 (1910).[7]

---

**5.** The dissent cites *Sharp v. State*, 3 Okl.Cr. 24, 104 P. 71 (1909) and *Jones v. State*, 3 Okl.Cr. 593, 107 P. 738 (1910), for the proposition that the law at the time of the commission of the offense governs the defendant's trial. In *Sharp* and *Jones*, the issue was whether the defendant's trial should be governed by the laws of Arkansas, which were the laws in effect at the time of the commission of the alleged offense, or the laws of Oklahoma, which went into effect after the commission of the offense. The Court determined that the retroactive application of Oklahoma law would materially and prejudicially affect the rights of the defendant. Likewise, in *Kring v. Missouri*, 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883), the Court would not give retroactive effect to a law which materially prejudiced the defendant and was therefore an ex post facto law. Naturally, laws which materially prejudice the defendant cannot be applied retroactively. However, as this Court determined in *Wade* and *Allen*, the application of the life without parole provision does not work to appellant's detriment.

**6.** Art. 5, § 54 provides: "The repeal of a statute shall not revive a statute previously repealed by such statute, nor shall such repeal affect any accrued right, or penalty incurred, or proceedings begun by virtue of such repealed statute."

**7.** The dissent's reliance on *United States v. Towne*, 870 F.2d 880 (2d Cir.1989), *cert. denied*, 490 U.S. 1101, 109 S.Ct. 2456, 104 L.Ed.2d 1010 (1989), is also misplaced because *Towne* involved the effect of the federal saving statute, 1 U.S.C. § 109, on a change in a sentencing statute. Likewise, in *Burge v. Butler*, 867 F.2d 247 (5th Cir.1989), the court did not give retroactive effect to a sentencing statute because of a Louisiana statute prohibiting the retroactive application of that statute. In addition, the court noted that the sentencing statute would violate the constitutional prohibition against ex post facto

The dissent's argument that the procedural change in the Oklahoma death penalty statute does not apply to appellant's trial is simply unavailing, unsupported by well-established Oklahoma law, and would result in a departure from precedent set down by this Court. Appellant's trial and conviction occurred after amended §§ 701.9 and 701.10 went into effect, and the life without parole provision was the applicable law. The trial court should have provided the life without parole option to the jury, and the trial court erred when it failed to do so.

The trial court's failure to provide proper sentencing instructions to a jury in a capital case is of critical importance. The death penalty is different from all other penalties in its severity and finality. *See Caldwell v. Mississippi*, 472 U.S. 320, 329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985). "Death, in its finality, differs more from life imprisonment than a 100–year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). Further, in *Beck v. Alabama*, 447 U.S. 625, 637, 100 S.Ct. 2382, 2389, 65 L.Ed.2d 392 (1980), *quoting Gardner v. Florida*, 430 U.S. 349, 357–358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977), the Supreme Court stated " 'the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose death be, and appear to be, based on reason rather than caprice or emotion.' " Because this Court lacks the power to grant relief to a man or woman who has been wrongfully executed, this Court, like all courts grappling with the difficult issues raised in capital cases, must act prudently and with the utmost fairness.

Moreover, contrary to the assertion set forth in the dissent, the "death is different" analysis set forth herein is not an arbitrary "fairness" doctrine. Rather, it is a fundamental constitutional principle recognized by the United States Supreme Court. *See Caldwell v. Mississippi*, 472 U.S. 320, 329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985). It is the role of an appellate judge to apply the law as laid down by the Supreme Court. Indeed, while we all, at times, may disagree with the Supreme Court's interpretations of the Constitution, we are bound by oath to follow and apply such rulings. We intend to do no less.

The Oklahoma Legislature, as representatives of the citizens of this State, has determined in some cases, life without the possibility of parole can accomplish the societal goals of retribution and deterrence, without resorting to the death penalty.[8] *Gregg v. Georgia*, 428 U.S. 153, 183, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1975) ("The death penalty is said to serve two principle social purposes: retribution and deterrence of capital crimes by prospective offenders"). The sentence of life without the possibility of parole offers the jury a more severe sanction than life imprisonment, but a less harsh penalty than death. A jury could well conclude that life without parole is the appropriate sanction in certain cases in which the State is seeking the death penalty.

The gravity of the death penalty and the legislature's clear determination that life without parole should be considered in sentencing a defendant who has been convicted of First Degree Murder warrant remand of this conviction for resentencing. Although appellant's crime occurred a few months before the effective date of the life without parole option, appellant's trial and conviction occurred seven months after the

laws. The federal savings statute and the Louisiana statute have no bearing on this case.

**8.** To apply the death penalty in a constitutional manner, the application of the death penalty must comport with the evolving standards of decency of the society. One measure of a society's evolving standards of decency is legislative enactments. *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).

effective date of the statutory change. Amended § 701.10 indicates that the triggering event for the application of the statute is not the appellant's crime, but rather the appellant's conviction. Amended § 701.10(A) specifically states "[u]pon *conviction* or adjudication of guilt of defendant of murder in the first degree, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without parole or life imprisonment." Ironically, the dissent cites *Freshour v. Turner*, 496 P.2d 389 (Okl.Cr.1972), *overruled on other grounds, Dean v. Crisp*, 536 P.2d 961 (Okl.Cr.1975), which concerned the application of a statute governing juvenile certification procedures. In finding that the juvenile statute in effect at the time of the commission of the crime governed the defendant's case, the Court looked at the language of the statute which specifically provided " '[i]f, during the pendency of a criminal or quasi-criminal charge against any person, it shall be ascertained that the person was a **child at the time of committing the alleged offense,** the court shall transfer the case.' " *Id.* at 392 (emphasis in original). In contrast, § 701.10(A) specifically states "[u]pon **conviction** or adjudication of guilt," the trial court shall conduct the sentencing hearing and the trier of fact will decide if the defendant should receive death, life imprisonment without parole, or life.

Further, § 701.10a sets forth the sentencing procedure when a case is remanded to the district court for resentencing. Section 701.10a, which was enacted in June 1989, provides that the defendant's sentencing options upon resentencing are life, life without parole, and death. Section 701.10a(5) further states "[t]he provisions of this section are procedural and shall apply retroactively." If the procedural provisions of § 701.10a are given retroactive effect and the procedural provisions of § 701.10 are not, this Court would create an anomalous situation and cause disparate treatment for certain individuals facing the death penalty. For example, someone whose trial and conviction occurred before the effective date of amended § 701.10, but whose case was remanded for resentencing, would receive the benefit of a life without parole instruction upon resentencing; but appellant, whose conviction occurred after the effective date of the statute, would not receive that benefit upon conviction. To bar appellant from the benefit of having a jury consider the life without parole option under these circumstances would violate due process and equal protection. *See generally Hicks v. Oklahoma*, 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980) (due process violated when jury provided with infirm sentencing instructions); *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977) (due process interest in capital sentencing procedures).

Under the precedents of this Court and the constitutional principles of due process and equal protection as established by the United States Supreme Court, appellant's case must be remanded for resentencing. If this Court does not take this appropriate action now, it is very likely that several years down the road another court, upon review of this case, will remand the case for resentencing. By acting now as we are clearly obligated to do, this Court is saving valuable state and judicial resources as well as providing certainty and resolution to this case.

The length of time it takes to process a death penalty case to finality is patently absurd. Our citizens are rightly outraged. Too often courts have abdicated their responsibility by affirming cases which the Supreme Court or some lower federal court later reverses on appeal, or habeas, or post-conviction review. While such affirmances may gain such courts some short term capital with the home folks, the long term effect is devastating to our system of federalism and to the concept of finality of judgment. We must apply the law as it is, not as we wish it were. Parties appearing before this Court and our citizens deserve no less.

This decision should not be construed beyond the very limited facts of this death

penalty case.[9] We will apply this analysis only in cases where the life without parole amendments to §§ 701.9 and 701.10 were in effect at the time of trial and conviction.

Accordingly, appellant's sentence of death must be VACATED and this cause REMANDED for RESENTENCING.

LANE, J., concurs.

LUMPKIN, P.J., concurs in part/dissents in part.

JOHNSON, V.P.J., specially concurs.

LUMPKIN, Presiding Judge, concurring in part/dissenting in part.

While I concur in the affirmance of the murder and burglary charges, I cannot join in this Court's decision to remand for re-sentencing. In making its ill-advised "death is different" analysis, this Court overthrows nearly nine decades of jurisprudence holding the proper punishment to be that which is on the books at the time the crime was committed.[1] In its rush to "fairness," this Court creates confusion and uncertainty on a far greater scale that has ever existed before by simply ignoring the facts of this case, which clearly show the option of life without parole just was not requested. Thus, it has effectively overruled *Wade v. State,* 825 P.2d 1357 (Okl.Cr. 1992), which supposedly "clarified" a principle that had no basis in the law of this State from its inception.

Our most recent decision dealing with the subject of retroactive application of punishment is *Bowman v. State,* 789 P.2d 631 (Okl.Cr.1990). In *Bowman,* we stated

with clarity that "the appropriate criminal penalty is the penalty in effect at the time the defendant commits the crime." *Id.* at 631 (citing *Penn v. State,* 13 Okl.Cr. 367, 164 P. 992 (1917) and *Alberty v. State* 10 Okl.Cr. 616, 140 P. 1025 (1914)). Federal courts repeatedly apply this basic principle of law. In *United States v. Towne,* 870 F.2d 880 (2d Cir.1989), *cert. denied,* 490 U.S. 1101, 109 S.Ct. 2456, 104 L.Ed.2d 1010 (1989), the Second Circuit found that the repeal of a statute prior to the defendant's being sentenced was inapposite because the statute was in effect at the time the underlying offenses were committed and at the time the defendant was convicted. *Id.* at 887. *See also Burge v. Butler,* 867 F.2d 247, 250 (5th Cir.1989).

In addition, a review of our jurisprudence reveals this principle was part of the legal foundation laid at statehood. One of the first cases was *Sharp v. State,* 3 Okl.Cr. 24, 104 P. 71 (1909). The defendant there committed an offense while Indian Territory was governed by the laws of the state of Arkansas. The defendant did not go to trial until after Oklahoma had become a state and enacted its statutes. The question before the Court was whether the laws of Arkansas or Oklahoma should be applied. The Court determined that application of the laws of the state of Oklahoma would seriously harm the defendant and the only choice was to use the laws which controlled at the time of the offense. Relying on a United States Supreme Court case, *Kring v. Missouri,* 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883), the Oklahoma

---

**9.** This Court is not overruling *Wade.* The dissent contends that appellant waived his right to have the jury instructed on the life without parole option. This is incorrect. Appellant, the district attorney, and the trial court were all operating under the mistaken impression that the life without parole option was not available to appellant. Appellant did not waive the life without parole option because he did not know he had that right. Further, an improper instruction on the range of penalties is fundamental error and cannot be waived. *Scott v. State,* 808 P.2d 73, 77 (Okl.Cr.1991); *Turner v. State,* 803 P.2d 1152, 1158–59 (Okl.Cr.1990).

**1.** The Court's opinion seeks to summarily dismiss the reasoning in this dissent by labeling

the punishment provision a "procedural" provision. Apparently in addition to Oklahoma case-law, the majority's "death is different" analysis would also completely ignore hornbook law, learned by every first-year law student: that punishment provisions are substantive, not procedural, in nature. *See* 22 C.J.S. *Criminal Law* § 2 (1989) ("The substantive law is that which as distinguished from the procedural law which provides or regulates the steps by which one who commits a crime is to be punished." (emphasis added)); 1 LaFave and Scott, *Substantive Criminal Law* § 1.2; *see also State v. Elmore,* 179 La. 1057, 155 So. 896, 897–98 (1934); *Gaspin v. State,* 76 Ga.App. 375, 45 S.E.2d 785, 788 (1947).

Court stated: "[t]he accused should be tried and dealt with under the law as it existed at the time of the commission of the crime of which he stands charged." *Sharp*, 3 Okl.Cr. at 31, 104 P. at 74. The Court reiterated this principle in *Bowman* when it determined that the sentence of ten years to life was proper because "[i]t is a well established rule of law that the appropriate criminal penalty is the penalty in effect at the time the defendant commits the crime." *Bowman*, 789 P.2d at 631. *See also Jones v. State*, 3 Okl.Cr. 593, 107 P. 738 (1910). The irony of the Court's attempt to apply "fairness" in this case is revealed by our decision in *Costa v. State*, 753 P.2d 393 (Okl.Cr.1988). In that case, the trial judge sentenced the defendant to life without parole, which was not a sentencing option at the time of the crime. Finding that the trial judge committed error with sentencing, this Court did not remand for sentencing, but struck the "without parole" portion of the sentence and remanded for the trial court to correct the error. *Id.* at 395.

Legal nuances of this type lead to an anomaly of the law. The anomaly then skews the principles of law which are to be applied and creates serious cracks in the foundation of our jurisprudence. In addition, it denigrates the principle that this is a nation of laws, and not of men.

The Court further compounds the error of its analysis through a partial review of the scope of the amendments to 21 O.S. 1981, §§ 701.9, 701.10, 701.11 and 701.15, which became effective November 1, 1987. A review of Senate Bill 15, contained in Chapter 96 of the Laws of the Forth–First Legislature, at page 360 and 361 of the session laws of the first regular session, reveal the only amendment to the then-existing statutory language was the addition of the life without parole language to each of those operative statutes. The session laws do not reflect any intent of the Oklahoma Legislature to attempt a retroactive application of this statutory amendment. In *Freshour v. Turner*, 496 P.2d 389 (Okl.Cr.1972), a defendant who was seventeen at the time of the offense tried to claim that she should get the benefit of a subsequently enacted bill which defined the term "child" as any person under the age of eighteen. This Court found that, because the language in the enactment did not show it was to be applied retroactively, the law may be applied prospectively only. *Id.* at 392.

Therefore, based on the principles of statutory construction and legislative intent, Appellant is not eligible for the punishment of life without parole in this case.

This Court, in its analysis, alludes to the often enunciated observation that "death is different." While the final nature of the death penalty may result in a more microscopic review of the facts of a case, it does not change basic principles of the application of a rule of law, or the manner of consistently applying the law. The basis of the United States Supreme Court's overturning the application of the death penalty in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), was there must be a consistent application of the law, and that the vague, arbitrary applications of the penalty be removed. That concept of consistency in the application of legal principles must be applied fairly to all aspects of the review in a criminal case, whether it applies to the State or a defendant. For the Court to do otherwise creates aberrations in the law which impede the orderly, consistent application of that law in the trial courts of this State.

The actions of the Court in this case, pursuant to some type of "fairness" review, disregard the facts of the case. The Appellant neither objected to the instructions given nor requested an instruction on this optional punishment. This Court should never take the position of trying to reinvent the trial strategy of an appellant's attorney in a trial. Trial judges are vested with a dual role of being fair and applying the law under the appropriate circumstance. The role of an appellate judge is to apply the law consistently and to ensure the rules of law are set forth to enable trial practitioners and trial judges to rely on those principles of law in the trial of cases. In this case, Judge Brock appropriately applied the substantive law of the crime at

the time it was committed. Granted, certain statutes were amended after the commission of the offense which had the effect of amending substantive provisions of the law. While procedural aspects may be declared to be applicable retroactively, pursuant to 22 O.S.1991, § 3, substantive amendments of the penal statute cannot. The procedure for conducting a resentencing proceeding is substantially different than an application of the penal provisions of the statutes based on when the crime was committed. The Court's analysis of a substantive provision skews the rules which apply to the retroactive effect of procedural matters.

It is in this vein that *Allen v. State*, 821 P.2d 371 (Okl.Cr.1991) was incorrectly decided.[2] For whatever reason, this Court allowed itself to get sidetracked on an *ex post facto* question. Every second-year law student knows that, when dealing with an *ex post facto* application, we by definition of the term necessarily *assume* the statute in question is to be applied retroactively. As an example, the cases of *Dobbert v. Florida*, 432 U.S. 282, 293, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977), and *Williamson v. State*, 812 P.2d 384, 407 (Okl. Cr.1991), both cited by the majority in support of its position, deal with considerations of *ex post facto* laws. By using these cases in support of its position a law should be applied retroactively, the majority is comparing retroactive apples and *ex post facto* oranges. The question here, and the core of this dissent, is not whether it is *constitutionally permissible* to apply a law retroactively, but whether the law *was meant to* be applied retroactively *at all.*

But that is not the end of the story. *Allen* dealt with a guilty plea and a trial judge who was uncertain whether he could consider the life-without-parole option, where the crime was committed before the new law went into effect and plea was

taken afterwards. There, the appellant had requested the option and executed a waiver to any constitutional right against the application of any *ex post facto* law. In *Wade v. State*, 825 P.2d 1357 (Okl.Cr. 1992), a jury trial case, the defendant also requested the life-without-parole option and executed a waiver. We held "[T]his error would not be available if the defendant did not, or refused to, request the life without parole instruction."

Basically, then, this Court created confusion where there was none by deciding *Allen*. It nurtured the confusion in *Wade*, which is wildly inconsistent both with *Allen* and with principles of retroactive application I have discussed above. Now, it makes the confusion even worse by deciding that an appellant need not even request the option to avail himself of it. Does the majority seek to overturn *Wade?* It does not so state.

Death is different; but law is law. This Court in its ruling today stresses the former and ignores the latter. Nearly nine decades of Oklahoma jurisprudence should have taught us better. I respectfully **DISSENT** to the decision to remand for resentencing.

JOHNSON, Vice Presiding Judge, specially concurring.

I must speak to what is obviously a trying and difficult case. One of the problems with the Bench and the Bar is wanting to know what the rule is. The court and attorneys may not like the rule but they do want as much uniformity as possible. The above-named wrote an opinion that had some relevance here but must be distinguished. *Wade v. State*, 825 P.2d 1357 (Okl.Cr.1992). That case had more to do with the double jeopardy issue and whether or not the life without parole issue had been or could be waived. After reflection

2. The Court's opinion correctly points out I concurred in result in *Allen,* and concurred in *Wade.* As this discussion both before this footnote and after it illustrates, further research and discussion at oral argument in this case has convinced me this Court was simply incorrect in its analysis. Unlike the majority, I am delighted to take this opportunity to admit I made a

mistake in my vote in those two cases. Also unlike the majority, I would use this opportunity to correct that mistake and attempt to eliminate confusion that has arisen on the issue. In so doing, I am in no way attempting to use 22 O.S.1981, § 3. That deals with procedural issues. As I pointed out in footnote 1, this is a question of *substantive* law.

upon the problem, to me double jeopardy does not even apply.

Judge Lumpkin has written a most effective Concur in Part/Dissent in Part opinion. I disagree because "death is different". Yes, the Court has made a rush to "fairness" but the Legislature has given us no other option. Judge Lumpkin's opinion is a brilliant survey of the law as it relates to retroactive application of punishment and a basic legal doctrine that the statute in effect at the time of the underlying offense is the one that applies at the time of the trial. In this particular case, the Legislature in its infinite wisdom, saw fit to pass a statute that gave a radical new or third possible punishment in the death case, that is, life without parole.

During our oral arguments on this and other cases, the State has conceded that with the amendment of 21 O.S. § 701.-10a(5), the Legislature has spoken in the event of a reversal. It would appear from the statute that in the event this case were reversed for any reason other than the life without parole issue, at the retrial or the resentencing portion thereof, a defendant would be entitled to the life without parole instruction even though the crime occurred prior to the time life without parole was effective. It would seem logical to me that if this was the legislative intent on 701.10a, then it should also have been that intent on 701.10. It would seem under fundamental "fairness", it would not be proper to disallow the life without parole option in one case that occurred prior to the enactment of the statute, but due to reversal allow it in another case. The law and the application thereof should be consistent.

This case is deeply perplexing and I, quite frankly, have had a difficult and trying time, not only based upon the legal doctrines that Judge Lumpkin has so ably pointed out, but the absolute uniqueness of this situation. The Legislature, in an intervening move, passed this radically different third alternative. Obviously, it would have been far easier had they indicated that the application would be retroactive; they did not chose to do so but I cannot state that

their silence means that that was not their intent. Having written *Wade*, I understand Judge Lumpkin's quest. Fundamental fairness says we must adopt a new or different doctrine due to the uniqueness of the third alternative punishment. This in no way changes the fundamental doctrine that Judge Lumpkin points to. The majority is correct.