Kelly Lamont **ROGERS, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–92–65.**

Court of Criminal Appeals of Oklahoma.

Jan. 24, 1995.

Order Denying Rehearing March 8, 1995.

Jack Bowyer, Perkins, Michael Stano, Stillwater, for defendant at trial.

Paul R. Anderson, Dist. Atty., Frank Muret, Asst. Dist. Atty., Stillwater, for State at trial.

Anne M. Moore, Appellate Indigent Defender, Norman, for appellant on appeal.

Susan Brimer Loving, Atty. Gen., A. Diane Blalock, Asst. Atty. Gen., Oklahoma City, for appellee on appeal.

## OPINION

CHAPEL, Vice Presiding Judge.

Kelly Lamont Rogers was tried by jury before the Honorable Donald L. Worthington in the District Court of Payne County. In Case No. CRF–90–412 he was convicted of First Degree Malice Aforethought Murder in violation of 21 O.S.1991, § 701.7; he was convicted of First Degree Robbery, 21 O.S. 1991, § 801, in CRF–91–26 and CRF–91–27; First Degree Rape, 21 O.S.1991, §§ 1111, 1114, in CRF–91–28; and Larceny of a Motor Vehicle, 21 O.S.1991, § 1720, in CRF–91–29, all after conviction of two or more felonies. The jury found 1) the murder was especially heinous, atrocious, or cruel; 2) there was a probability that Rogers would commit criminal acts of violence that would constitute a continuing threat to society; and 3) Rogers had previously been convicted of a felony involving violence. Rogers was sentenced to death for the murder conviction, fifty years and seventy-five years for each robbery charge respectively, one hundred fifty years for rape, and fifty years incarceration for larceny. From these convictions

Rogers has perfected his appeal, raising eleven propositions of error.

On December 19, 1990, Rogers and his girlfriend, Audra Todd, ordered a pizza from Pizza Express. Karen Lauffenburger, a student at Oklahoma State University, delivered the pizza to Todd's apartment. After receiving the pizza, Rogers followed Lauffenburger, robbed her of her $40.00 Pizza Express "bank" and demanded more money. They drove to Lauffenburger's apartment, where she got her automatic teller machine (ATM) bank card. Next, they drove to a nearby ATM, and she first enquired about her bank balance, then withdrew all her money. The two returned to Lauffenburger's apartment. Lauffenburger's fiancee, Peter Gilmartin, found her there nude at approximately 10:00 p.m., dead from nine stab wounds in the chest, neck and abdomen. At some point during the evening Lauffenburger was raped. Sperm consistent with Rogers (but inconsistent with Gilmartin) was found on vaginal swabs, Lauffenburger's panties and jeans. She had peri- or postmortem vaginal injuries consistent with nonconsensual sexual intercourse. Rogers was subsequently arrested and questioned. He eventually admitted stabbing Lauffenburger but insisted that they had consensual sexual intercourse.

## PRETRIAL ISSUES

■ Rogers claims in his first proposition that the trial court erred in denying his request for state funds to hire a private investigator and forensics experts. Rogers argues in subproposition A that the denial violated his rights under the Fourteenth Amendment to the United States Constitution. The Supreme Court has held that Oklahoma must provide psychiatric experts to a defendant who made a preliminary showing that sanity at the time of the offense was likely to be a significant factor at trial.[1] The Court set forth a three-part test to determine whether a defendant needs access to psychiatric experts: 1) the defendant's private interest in the accuracy of the proceedings; 2) the State's interest affected by providing the assistance; and 3) the probable value of the procedural safeguards sought and the risk of inaccuracy in the proceedings without the requested assistance.[2] Rogers and the State each cite several cases from this Court as well as cases from other jurisdictions to support their respective arguments that Ake has or has not been extended to other expert assistance. A chronological review of this Court's cases shows that the principles of Ake have been extended to any expert necessary for adequate defense.[3]

1. *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

2. *Ake*, at 105 S.Ct. at 1093–94.

3. *Green v. State*, 881 P.2d 751 (Okl.Cr.1994) (*Ake* extended to any expert necessary for an adequate defense upon proper showing); *Salazar v. State*, 852 P.2d 729 (Okl.Cr.1993) (*Ake* extended to any expert necessary for an adequate defense upon proper showing); *Washington v. State*, 836 P.2d 673 (Okl.Cr.1992) (applies *Ake* test without discussing whether case extended); *Smith v. State*, 819 P.2d 270, 276 (Okl.Cr.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2312, 119 L.Ed.2d 232 (1992) (no discussion of *Ake,* defendant did not show necessity or inability to pay); *Tibbs v. State*, 819 P.2d 1372 (Okl.Cr.1992) (Court has extended *Ake* to include experts necessary for an adequate defense upon proper showing); *Banks v. State*, 810 P.2d 1286 (Okl.Cr.1991), *cert. denied,* 502 U.S. 1036, 112 S.Ct. 883, 116 L.Ed.2d 787 (1992) (*Standridge* left question open, *Ake* not yet extended, uses *Ake* analysis); *Williamson v. State*, 812 P.2d 384, 400 (Okl.Cr.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992) (*Ake* not extended, defendant did not show

need for expert); *Washington v. State*, 800 P.2d 252 (Okl.Cr.1990) (Court has not extended *Ake* but test is whether defendant was denied basic tools of defense); *Shelton v. State*, 793 P.2d 866 (Okl.Cr.1990) (*Standridge* left question open and *Vowell* said investigator was not mandated, defendant showed neither denial of access to material evidence or substantial prejudice); *Moore v. State*, 788 P.2d 387 (Okl.Cr.1990) *cert. denied,* 498 U.S. 881, 111 S.Ct. 227, 112 L.Ed.2d 182 (1989) (focus on showing of prejudice, no discussion of *Ake*); *Childers v. State*, 764 P.2d 900 (Okl.Cr.1988) (cites *Standridge* for holding that *Ake* not extended, focus on showing of prejudice); *Munson v. State*, 758 P.2d 324 (Okl.Cr.1988), *cert. denied,* 488 U.S. 1019, 109 S.Ct. 820, 102 L.Ed.2d 809 (1989) (cites *Standridge* for holding that *Ake* not extended, focus on effective assistance and showing of prejudice); *Rojem v. State*, 753 P.2d 359 (Okl.Cr.1988), *cert. denied,* 488 U.S. 900, 109 S.Ct. 249, 102 L.Ed.2d 238 (1988) (cites *Plunkett* for lessened risk of inaccuracy with forensics experts, says *Ake* does not require State to give indigents assistance others could purchase); *Brown v. State*, 753 P.2d 908 (Okl.Cr. 1988) (defendant did not show need for and was not denied access to psychiatrist and not denied

■ Before a defendant may qualify for such expert assistance, he must make a showing of need and show that he will be prejudiced by the lack of expert assistance. Rogers meets neither requirement here. In his Application for Employment of Expert Witness at State Expense, filed February 12, 1991, Rogers claims poverty, says he believes he has a valid defense but is unable to locate (unnamed) key witnesses, and states that a private investigator is necessary for a proper investigation and preparation of his case. In his Application for Employment of Private Investigator at State Expense, filed May 17, 1991, Rogers repeats his prior claims without elaboration. In his second Application for Employment of Expert Witness at State Expense, filed September 19, 1991, Rogers claims only that he is indigent and has a valid defense to the crimes charged. In the Motions Hearing of September 19, 1991, Rogers requested funds for a) an investigator to aid and assist counsel in gathering witness statements and/or exculpatory evidence, b) forensics experts to make sure that the State's expert opinions were "true and correct", and c) a doctor to "go over" the medical examiner's results and conclusions. While the trial court erroneously believed *Ake* would not extend to these requests, the court noted that it would reconsider the applications, especially if Rogers made a "precise particular. application for a certain expert on a certain point." When arguing his motion in objection to the Bill of Particulars, Rogers did not again request an expert but argued that he had not been provided a DNA expert and could not substantiate whether DNA testimony would show Lauffenburger was conscious at the time of the rapes. Before voir dire began Rogers moved for a continuance based on a search for a witness, Lassiter: Rogers noted that he had been denied state funds for an investigator but eventually counsel hired an investigator out of pocket as "we believe that those police reports and Mr. Lassiter's statements will be critical and crucial as far as the defense is concerned." This claim is the most specific statement Rogers ever makes regarding a showing of need or prejudice resulting from lack of expert assistance, and it in no way meets the requirements for either.

■ Rogers argues in subproposition B that his right to effective assistance of counsel was violated by the denial of funds. The test for ineffective assistance of counsel is whether an attorney's performance is so deficient that the defendant did not have counsel which the Sixth Amendment guarantees, and the defense was prejudiced through counsel's deficient performance by errors so serious as to deprive the defendant of a fair trial with reliable results. In death cases, there must be a reasonable probability that, absent errors, the sentencer would have concluded the balance of aggravating and mitigating circumstances did not equal a death sentence.[4] There is a strong presumption that counsel's conduct was professional, and the defendant must overcome the presumption that counsel's conduct equalled sound trial strategy. On appeal the court will (1) consider counsel's challenged conduct on the facts of the case as viewed at the time, (2) ask whether the conduct was professionally unreasonable, and, if so, (3) ask whether the error affected the jury's judgment.[5]

basic tools of defense, citing *Ake*); *Castro v. State,* 745 P.2d 394 (Okl.Cr.1987), *cert. denied,* 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988) (*Standridge* left question open, holds defendant not denied basic tools of defense); *Woodard v. State,* 743 P.2d 662 (Okl.Cr.1987), (cites *Plunkett* for lessened risk of inaccuracy with forensics experts and holds defendant not denied basic tools of defense); *Johnson v. State,* 731 P.2d 993, 1004 (Okl.Cr.1987), *cert. denied,* 484 U.S. 878, 108 S.Ct. 35, 98 L.Ed.2d 167 (1988) (*Ake* may require access to other experts, uses *Ake* 3–part test); *Vowell v. State,* 728 P.2d 854 (Okl.Cr.1986) (citing *Liles,* says *Ake* is not extended to every possible means to defend); *Plunkett v. State,* 719 P.2d 834 (Okl.Cr.1986) (risk of inaccuracy not high with forensic evidence, defendant not de-

nied basic tools of defense); *Liles v. State,* 702 P.2d 1025 (Okl.Cr.1985), *cert. denied,* 476 U.S. 1164, 106 S.Ct. 2291, 90 L.Ed.2d 732 (1986) (held defendant did not show need for psychiatrist under *Ake,* does not contain language cited in *Vowell*); *Standridge v. State,* 701 P.2d 761 (Okl.Cr.1985) (did not determine whether *Ake* was extended, held defendant received basic tools of defense).

4. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984); *Coleman v. State,* 693 P.2d 4, 7 (Okl.Cr.1984).

5. *Miller v. State,* 751 P.2d 733, 734 (Okl.Cr. 1988).

■ Rogers claims that the State's action in refusing to fund investigators and forensics experts created a small likelihood that any attorney could provide effective assistance of counsel. He argues that, without a separate investigation or expert preparation, counsel was unable to intelligently challenge the State's evidence. This claim founders on the trial record. Counsel not only filed and argued numerous motions, made abundant objections at trial, requested instructions, and presented evidence in mitigation during the second stage, but also vigorously challenged the State's evidence, particularly forensic evidence, through cross-examination and motions at every opportunity. Rogers cannot meet the test above.

■ Finally, Rogers argues in subproposition C that the trial court's denial of requested funds violated his right to equal protection under the laws. Rogers argues vigorously here, as at trial, that he was treated differently from other indigent capital defendants. At the time of the crimes Oklahoma law allowed trial courts in capital cases to provide expert assistance to indigent defendants if such experts were necessary to an adequate defense upon a showing of need.[6] This statute was repealed when the indigent defense system was reorganized effective July 1, 1991. The Capital Litigation Division of the Oklahoma Indigent Defense System was created to handle all indigent capital trials except those in Tulsa and Oklahoma Counties, and the legislation provided for state-funded defense experts.[7] Rogers' trial did not begin until December 9, 1991. After the OIDS enabling legislation was passed counsel argued spiritedly and often that, under the new legislation, the Capital Division should be responsible for the trial and Rogers was entitled to state-funded experts. The trial court determined that the Capital Division did not yet exist and was unable to take the case and noted several times that counsel had been appointed by the court under the former statute and was competent to handle the case. Rogers correctly notes that, had he been in Tulsa or Oklahoma County or represented by OIDS, he would have been entitled to state-funded experts. His argument is interesting and carries some moral force, but he completely fails to show he was harmed by the lack of expert assistance.

As a result of the timing of OIDS legislation, Rogers may or may not have been treated differently than other indigent capital defendants. However, he has shown neither need for expert assistance nor that the lack of such assistance resulted in prejudice. Rogers' counsel was not ineffective and neither his rights to due process nor equal protection of the laws were violated.

## ISSUES RELATING TO GUILT AND INNOCENCE

In his second proposition Rogers claims that his first degree rape conviction should be reversed. In four subpropositions Rogers offers several reasons to reverse the rape charge, and in a fifth subproposition argues that the improper rape prosecution fatally prejudiced the capital sentencing.

Rogers claims in subproposition A that the trial court erred in denying his motion to quash the Information in CRF–91–28 [8] which charged him with first degree rape. The Information in CRF–91–28 stated:

"[O]n or about the 10th day of December, 1990 ... in Payne County ... did ... willfully, wrongfully, unlawfully, and feloniously with the use of force and violence and by means of threats of immediate and great bodily harm to one Karen Marie Lauffenburger, a female person not the wife of the said defendant, overcome all resistance on the part of [Lauffenburger], and did then and there rape, ravish, carnally know and have sexual intercourse with said female against her will and consent, said defendant being over the age of 18...."

■ An Information must allege every element of a charged offense and apprise

6. 22 O.S.Supp.1985, § 464(B).

7. 22 O.S.1991, § 1355.4.

8. Rogers erroneously refers to this in his title as CRF–90–412. That Information charged Rogers with first degree murder.

a defendant of what he must meet at trial.[9] Rogers argues that this Information merely parrots the statutory definition of rape without informing him what specifically he must defend against. He relies on *Plotner*, where this Court held that an Information charging attempted first degree rape cannot simply allege an attempt to have sexual intercourse, but must describe an overt physical act or actual personal threat.[10] This holding is distinguished by the charged offenses; Rogers was charged with actual, not attempted, rape, and the phrase "sexual intercourse" has a definite and easily understood meaning in connection with a charge of completed rape. Where an Information alleges a date and victim certain and every material element of rape, it may be phrased in terms of statutory language if the jury is instructed that penetration is an element of the crime.[11] Rogers' jury was properly instructed that sexual intercourse was the actual contact of the sexual organs of a man and woman, along with actual penetration. The Information alleged every element of the offense and sufficiently apprised Rogers of what he must meet.

■ Rogers claims in subproposition B that the State's proof of rape presented at trial was at variance with the allegations in the Information. The Information charged Rogers with first-degree rape, and evidence was presented at trial to support that charge. During closing the State argued that evidence showed Rogers raped Lauffenburger twice. Arguments are not evidence. In Rogers' Reply Brief he argues in the alternative that the State violated his due process rights by arguing outside the evidence. On the contrary, the State's argument was based completely on the evidence presented at trial. This subproposition is without merit.

■ Rogers next argues in subproposition C that the trial court erred in modifying the standard OUJI instruction on rape to eliminate the requirement that intercourse be with a living person. Rogers complains of the omission of the phrase "with a person" from the otherwise standard OUJI–CR 479 jury instruction given as No. 42. Rogers did not specifically object to this instruction at trial (he objected generally to the use of any OUJI instruction) so this Court will review for plain error only.[12] Instruction 42 correctly informed the jury that first degree rape required sexual intercourse accomplished by means of force, etc., which overcomes that person's resistance. This Court declines to adopt Rogers' argument that a jury could infer the phrase "that person" refers to a corpse, as the context of the instruction clearly presupposes a living human being. Although the better practice would have been to give the standard OUJI instruction, the phrase "that person" was contained in the Instruction and the jury was informed that rape required a living person.[13]

■ Rogers argues in subproposition D that the evidence was insufficient to support his conviction for first degree rape. On appeal, this Court will not disturb a verdict where, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[14] This Court will not disturb a verdict on appeal where competent evidence supports the jury findings even if testimony conflicts.[15] That Rogers and Lauffenburger

9. *Miller v. State*, 843 P.2d 389 (Okl.Cr.1992); *Plotner v. State*, 762 P.2d 936, 940 (Okl.Cr.1988). The State cites several cases with less stringent requirements which *Miller* superseded.

10. *Plotner*, 762 P.2d at 942.

11. *Wade v. State*, 556 P.2d 275 (Okl.Cr.1976).

12. *Shelton v. State*, 793 P.2d 866, 871 (Okl.Cr. 1990); *Ashinsky v. State*, 780 P.2d 201, 206 (Okl. Cr.1989).

13. In his Reply Brief Rogers overlooks the language in Instruction 42 and claims that the State's closing argument told the jury intercourse with a corpse would be rape. The State did erroneously argue that Rogers raped Lauffenburger after she was dead. However, arguments are not evidence and the trial court, not attorneys, instructs the jury. The instructions fairly and accurately stated the applicable law.

14. *Spuehler v. State*, 709 P.2d 202 (Okl.Cr.1985).

15. *Woodruff v. State*, 846 P.2d 1124, 1134 (Okl. Cr.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 349, 126 L.Ed.2d 313 (1994).

had sexual intercourse is undisputed; Rogers admitted intercourse and sperm consistent with him was found on vaginal swabs and Lauffenburger's clothing. Rogers claimed in his statement to officers, which was admitted at trial, that:

- He met Lauffenburger the evening of December 18, 1990, and they rode around for several hours and arranged to meet again.
- Lauffenburger picked Rogers up at his sister's house sometime after 6:00 p.m. on December 19 and they went to her apartment.
- She took him to her bank's ATM and withdrew all her money to buy him a Christmas present.
- They returned to her apartment and had consensual sexual intercourse.
- Rogers then developed a bad headache, found a knife in the kitchen and stabbed Lauffenburger several times.

Rogers claims that the State failed to prove nonconsensual intercourse and failed to present evidence that Lauffenburger resisted or that Rogers used force or threats. Lauffenburger's mother testified that she was with her daughter all evening on December 18, and Peter Gilmartin also saw Lauffenburger that evening. Lauffenburger reported to work at Pizza Express on December 19 by 5:30 p.m. and delivered at least one pizza order before going to Audra Todd's. Todd testified that Rogers did not know Lauffenburger, had decided to rob the pizza delivery person (without knowing who it would be), and took a knife from Todd's house when he followed Lauffenburger. Lauffenburger had defensive wounds on her hands and bruising inside her mouth consistent with someone applying pressure to her mouth. Lauffenburger had vaginal tearing injuries which were inflicted at or after death. The medical examiner confirmed that those could have been caused by intercourse but specifically stated those wounds could not have resulted from consensual intercourse because Lauffenburger would have been unable to consent at that point. Although Lauffenburger was found nude, sperm consistent with Rogers was found inside the crotch of her panties and jeans.

While Rogers' statement and trial testimony conflict, a jury could have found from the evidence that the sexual intercourse involved both force and a lack of consent. We conclude that the evidence was sufficient to sustain the rape conviction.

Rogers finally argues in subproposition E that the improper prosecution for first degree rape undermined the reliability of the capital sentencing proceedings. On the contrary, the rape prosecution was meritorious and supported by the evidence and could have had no improper effect on the capital sentencing proceedings. To summarize, the Information alleging first degree rape was sufficient and not at variance with the evidence presented. The jury instructions were proper, the evidence was sufficient to support the rape conviction, and the rape prosecution did not affect the reliability of the capital sentencing proceedings.

 In proposition three Rogers claims that the trial court erred in failing to instruct the jury on exculpatory statements. An exculpatory statement is one regarding a tangible factual matter capable of specific disproof which tends to clear a defendant from guilt or justify his actions. When the State introduces an exculpatory statement which, if true, would entitle the defendant to acquittal, he must be acquitted unless the statement has been disproved or shown to be false by other direct or circumstantial evidence in the case.[16] This is embodied in OUJI–CR–816. Rogers claims that the trial court erred in failing to give OUJI–CR–816 **sua sponte** after hearing the evidence of Rogers' statement claiming consensual intercourse. Rogers neither requested the instruction nor objected to the trial court's failure to give it, so this Court will review for plain error only. As the victim was dead, the State could bring forth no direct evidence to disprove Rogers' claim of consent. However, the testimony of Lauffenburger's mother, fiancee, colleagues, employer and Audra Todd, plus the condition of the body, disproved or

---

16. *Sadler v. State,* 846 P.2d 377 (Okl.Cr.1993); *Stiles v. State,* 829 P.2d 984 (Okl.Cr.1992); *Knott v. State,* 432 P.2d 128 (Okl.Cr.1967); *Mitchell v. State,* 408 P.2d 566 (Okl.Cr.1965).

showed as false significant portions of Rogers' claim.[17] The State presented circumstantial evidence refuting Rogers' statement and he was not entitled to an acquittal on the charge of first-degree rape. The trial court did not err in neglecting to sua sponte instruct the jury on exculpatory statements.

Rogers argues in proposition four that he was prejudiced by the admission of other crimes evidence and an evidentiary harpoon. He first claims in subproposition A that the trial court erred in admitting evidence of the purchase and use of crack cocaine as part of the **res gestae** or under an unspecified exception to the general prohibition against other crimes evidence. Todd testified that Rogers returned from Lauffenburger's apartment with approximately $200, which they immediately used to purchase crack cocaine. Rogers argues in four subparts that this evidence was improperly admitted as other crimes evidence, was unduly prejudicial, and that the trial court erred in failing to give a limiting instruction.

The State's *Burks*[18] notice regarding this testimony indicates that it would be offered as part of the **res gestae** because the proceeds of the robbery were used for the purchase of contraband on the same date as the robbery/homicide, and as other crimes to prove plan, scheme, design, motive, and lack of mistake or accident. However, argument focused exclusively on the question of **res gestae** and the trial court's ruling appeared to be based on **res gestae**. At trial Rogers objected strenuously and unsuccessfully to this evidence as improper other crimes evidence and because Todd's testimony concerning it was uncorroborated.

 The State appears to be correct in its contention that this was offered and admitted as part of the **res gestae,** rather than as other crimes evidence.[19] Evidence is considered **res gestae** a) when it is so closely connected to the charged offense as to form part of the entire transaction, b) when it is necessary to give the jury a complete understanding of the crime, or c) when it is central to the chain of events.[20] The State argues that the robberies, rape, murder, vehicle larceny, and subsequent purchase of cocaine with the robbery proceeds form one complete transaction, but we are unpersuaded that evidence of the cocaine buy is necessary to the jury's understanding of the sequence of events. What Rogers did with the money is irrelevant to the crimes charged, which were completed when he left the scene in Lauffenburger's car. This evidence was somewhat prejudicial, as it could not have helped Rogers' case for the jury to hear he was a crack user and infer that the whole episode was merely a means to purchase drugs. However, given the evidence presented against Rogers and his admission that he stabbed Lauffenburger, the jury could have ignored the evidence of crack cocaine activity when they reached a guilty verdict.[21]

17. See the discussion above of the evidence sufficient to support Rogers' conviction for first degree rape.

18. *Burks v. State,* 594 P.2d 771 (Okl.Cr.1979), overruled in part on other grounds *Jones v. State,* 772 P.2d 922 (Okl.Cr.1989).

19. Rogers' arguments and case law focus exclusively on other crimes evidence. Rogers mistakenly contends that **res gestae** evidence must meet the requirements set forth in *Burks.* In fact, *Burks* specifically distinguishes **res gestae** from other crimes evidence, and its requirements go only to the latter. Motive is not usually an element of robbery, i.e., the reason a particular object is stolen usually has no bearing on proof of the elements of the crime. The State suggested in its *Burks* notice that evidence of the crack buy could provide motive for the robbery but did not pursue that argument at trial. The defense argued at trial that anybody intending to rob Lauffenburger would have stolen the jewelry she wore as well as Christmas packages at the apartment. In light of this the State might have been justified had they argued that the drug buy showed motive as anyone committing robbery in order to purchase drugs would steal cash.

20. *See, e.g., Coates v. State,* 773 P.2d 1281 (Okl. Cr.1989); *Dunagan v. State,* 755 P.2d 102 (Okl. Cr.1988); *Johnson v. State,* 725 P.2d 1270 (Okl. Cr.1986); *Carter v. State,* 698 P.2d 22 (Okl.Cr. 1985); *Bruner v. State,* 612 P.2d 1375, 1377 (Okl.Cr.1980).

21. Rogers complains that the trial court failed to give a limiting instruction regarding the crack cocaine evidence. Rogers several times asked for a mistrial or to have the jury admonished to completely disregard this part of Todd's testimony because her statements were uncorroborated, but he never requested any limiting instruction. Rogers did not object specifically to the instructions given, although he did object to the general

Rogers complains in subproposition B that Officer Romine improperly volunteered prejudicial testimony about Rogers' prior convictions during the first stage. An evidentiary harpoon is improper testimony by an experienced officer who voluntarily and not in response to a question willfully interjects information regarding other crimes intending to prejudice a defendant, where the statement does prejudice the defendant.[22] An officer should not interject an evidentiary harpoon even in response to defendant's cross-examination, but the error may not be prejudicial if invited by the defendant.[23] Any error will usually be cured where the trial court admonishes the jury not to consider the answer.[24]

At police request, Rogers voluntarily went to the police station and was initially questioned by Officer Romine. At the preliminary hearing, the State asked Romine to start at the beginning of the interview and tell the trial court what occurred. Romine replied that Rogers told him he just got out of prison and was on parole. At trial, the State asked Romine to tell the jury what he asked and what Rogers told him in their interview, and Romine did not mention Rogers' remark about prison and parole. On cross-examination, Rogers took Romine step by step through that day and asked Romine what happened at the police department; Romine replied that they started talking and Rogers advised him of his previous criminal record. The trial court ruled that this was not an evidentiary harpoon. Rogers' request for a mistrial was denied, but the trial court admonished the jury to disregard the question and answer, and granted a brief continuance so the State could admonish Romine.

This statement was not an evidentiary harpoon. Romine did not voluntarily interject an extraneous comment but responded to Rogers' question. The State's question was narrowly focused. Romine's answers in preliminary hearing and trial were consistent. Rogers' counsel was present at the preliminary hearing and should have known what Romine would answer if asked about their initial conversation. Any possible prejudice was cured by the trial court's admonition.

To summarize, the evidence of crack cocaine was not "other crimes" evidence and was improperly admitted as part of the **res gestae.** Given the minimal prejudice resulting from the evidence, the other evidence against Rogers, and Rogers' admission to the murder, erroneous admission of the other crimes evidence was harmless. Officer Romine's response to Rogers' question was not an evidentiary harpoon and any possible error was cured by the trial court's admonition.

In proposition five Rogers claims his two robbery convictions violate the prohibition against double jeopardy, and the prejudice from the improper stacking of robbery charges rendered his death sentence unreliable. Rogers was charged in CRF–91–26 with conjoint robbery. He and Todd were accused of taking $40.00 of Pizza Express money from Lauffenburger on December 19. In CRF–91–27 Rogers was charged singly with robbery and accused of taking $175.00 of Lauffenburger's money from her on December 19. Evidence indicated that 1) Rogers and Todd agreed to rob the pizza delivery person, 2) Rogers took a knife from Todd's house and followed Lauffenburger after she delivered Todd's pizzas, and 3) Rogers took approximately $40.00 in Pizza Express money which Lauffenburger carried. Evidence also showed that Rogers subsequently asked for more money and that Rogers and Lauffenburger went to her apartment, an ATM machine, checked her balance, and withdrew $175.00. Lauffenburger's empty Pizza Ex-

---

use of any OUJI instructions. This Court need not reach the issue of whether a limiting instruction would be required for evidence admitted as **res gestae**, since Rogers did not preserve the question. A review of the record reveals no plain error in the trial court's failure to give a limiting instruction.

**22.** *Riley v. State,* 760 P.2d 198 (Okl.Cr.1988); *Dixon v. State,* 737 P.2d 942 (Okl.Cr.1987).

**23.** *Maxville v. State,* 629 P.2d 1279 (Okl.Cr. 1981); *Holt v. State,* 489 P.2d 504 (Okl.Cr.1971).

**24.** *See, e.g., Armstrong v. State,* 763 P.2d 113, 114 (Okl.Cr.1988); *Kitchens v. State,* 513 P.2d 1300, 1304 (Okl.Cr.1973).

press money pouch was found near her purse in her apartment. The $175.00 was not found in the apartment. When Rogers returned from Lauffenburger's apartment, Todd saw that he had more than $200.00.

■■■■ Rogers' double jeopardy claim relies on *Mansfield v. Champion*,[25] which held that, under Oklahoma law, convictions on two separate robbery charges violate double jeopardy when the only distinguishing element is the ownership of money taken from a single victim in a single transaction. In *Mansfield* the defendants robbed a store and were separately prosecuted for the robbery of the store's money and whiskey and the clerk's wallet, all of which were taken from the clerk at the same time. *Mansfield* relies on *Honeycutt v. State*,[26] where double jeopardy attached when a defendant was convicted in two separate counts of the same offense arising from a single transaction. However, separate transactions will exist where the evidence of each is identical but each requires dissimilar proof.[27] The fact that crimes are committed in rapid succession does not negate separate crimes as long as a separation does exist.[28]

■■■■ The evidence presented at trial indicates there were two separate robbery transactions here. Rogers and Todd clearly first agreed simply to rob the pizza delivery person; CRF–91–26 reflects that robbery. Afterward, Rogers, acting alone, determined to rob Lauffenburger of more money and performed several acts to that end. That robbery was charged in CRF–91–27. *Mansfield* is clearly distinguishable, as there was only one transaction in that case. The prohibition against double jeopardy was not violated. There was no improper "stacking" of offenses and thus no error infected the capital sentencing proceedings.

■■■■ In his sixth proposition Rogers argues that the evidence was insufficient to sustain his robbery convictions. Rogers first claims in subproposition I that the robbery convictions cannot stand because the State did not prove Lauffenburger was alive and in fear when the money was taken from her apartment. As Rogers notes, robbery is a crime against the person. Thus the proper question is whether the evidence showed Lauffenburger was alive and in fear when the money was taken from her. Todd testified that she and Rogers agreed to rob the pizza delivery person and that Rogers, with a knife, disappeared after Lauffenburger left Todd's apartment. Todd said Rogers told her he held a knife to Lauffenburger's neck and got the Pizza Express money. Todd also testified that Rogers said he asked Lauffenburger for more money, got her ATM card from her apartment and withdrew her money from the ATM machine, hiding the knife from the surveillance camera. An eyewitness saw Rogers leaving Lauffenburger's apartment (and believed he directed Lauffenburger down the stairs) between 7:45 p.m. and 8:15 p.m.; the ATM transactions occurred about 7:50 p.m. The videotape from the ATM machine, introduced at trial, showed Rogers and Lauffenburger alive withdrawing cash from the machine; the ATM receipts from her balance inquiry and withdrawal also reflect those transactions.[29]

25. 992 F.2d 1098 (10 Cir.1993).

26. 755 P.2d 105 (Okl.Cr.1988).

27. *Salyer v. State*, 761 P.2d 890 (Okl.Cr.1988); *Weatherly v. State*, 733 P.2d 1331, 1336 (Okl.Cr. 1987).

28. *Salyer*, 761 P.2d at 890; *Weatherly*, 733 P.2d at 1338; *Johnson v. State*, 650 P.2d 875 (Okl.Cr. 1982) (separate crimes where robbery of fast-food cashier and customer); *Cf. Keeling v. State*, 810 P.2d 1298 (Okl.Cr.1991) (no separate crime where robbery of several cashiers at one grocery).

29. The ATM videotape shows a series of still pictures taken at intervals every few seconds. The first relevant frame shows Lauffenburger entering alone. In the next frame Lauffenburger is directly in front of the ATM machine, barely visible as Rogers is immediately behind her with both arms raised and at least one hand visible. Nothing shows in Rogers' pants pockets. In subsequent frames Rogers leans more closely against Lauffenburger, blocking her into the ATM machine, with both arms raised and leaning against the machine frame and a shiny object visible in one pants pocket. During succeeding frames Lauffenburger's right arm is seen in various positions, her profile and face are vaguely visible, and Roger's arms and head travel downwards towards Lauffenburger and the ATM. While it is impossible to determine either Rogers' or Lauffenburger's demeanor from the still frames, the jury could infer from their relative

Two outstanding checks on Lauffenburger's bank account were introduced to show that, by withdrawing her entire bank balance, she left her account overdrawn, negating the claim that the withdrawal was planned or intentional. Although bloodstains were found around the Pizza Express bag in Lauffenburger's apartment, this demands neither a conclusion that the money was taken there nor that Lauffenburger was dead at the time. Viewing the evidence above in the light most favorable to the State, any rational trier of fact could have found the essential elements of robbery.

▪ Rogers also argues in subproposition II that Todd's uncorroborated accomplice testimony did not support Rogers' convictions for robbery. Todd was charged with conjoint robbery along with Rogers in connection with the pizza delivery money and pled to that charge before trial. The jury was properly instructed that Todd was an accomplice, that her testimony had to be corroborated by independent evidence tending to connect Rogers with the commission of the crime by direct or circumstantial evidence, that the corroboration need be only as to some material fact, not as to every point, and that the corroborating evidence need not independently establish the commission of the crime. Rogers did not object to these instructions but did unsuccessfully request that the court alternately instruct the jury that Todd was a principal.

▪ Rogers first appears to argue that Rogers and Todd were each accomplices to the crime as well as principals, so Todd's testimony cannot corroborate Rogers' statement as he is a fellow accomplice. Rogers incorrectly claims that Oklahoma law makes no distinction between accomplices and principals. His cited cases refer to the lack of statutory distinction between accessories and principals and do not discuss accomplices. In fact, case law and the OUJI instructions clearly show that Oklahoma distinguishes between accomplices and principals. Rogers is the principal in these crimes, not an accom-

plice, and his statements may be corroborated by Todd's testimony (if appropriately corroborated by independent evidence). In any case, Rogers never admitted to any robberies and claimed that Lauffenburger gave him the money.

▪ Rogers then claims that no independent evidence connecting him to the commission of the crimes supports Todd's evidence. If as little as one material fact in Todd's testimony is supported by independent evidence, the jury may infer she spoke the truth.[30] A summary of Todd's testimony and the independent evidence shows:

- Todd said she and Rogers went to a convenience store, got a pizza coupon from the phone book, and used the store telephone to order a pizza. Burch, the store clerk, was on duty, gave them the coupon from the phone book, and saw them use the telephone.

- Todd said she requested a special cut pizza order with a coupon. Brown, who took the order, confirmed this.

- Todd said the pizzas were delivered by a white woman at approximately 7:00 p.m. Zanotelli, Lauffenburger's supervisor, said she left at 6:50 p.m. with Todd's pizza order to go to the address Todd gave. Testimony at trial established that Lauffenburger was white.

- Todd said that a white man came by later that evening to see if the pizzas were delivered. Zanotelli testified he went to Todd's apartment to check on Lauffenburger and the delivery.

- Todd said Rogers told her he asked Lauffenburger for more money after he took the pizza money, went to her apartment, and went to the ATM machine. The ATM receipts and videotape show that Lauffenburger, accompanied by Rogers, withdrew all her money from her account. The time of the withdrawal was between the time Lauffenburger delivered the pizza and Rogers disappeared, and the time Rogers returned to Todd and Lauffenburger's body was found. An eyewitness saw

body positions that Rogers trapped Lauffenburger at the machine.

30. *Sellers v. State*, 809 P.2d 676, 686 (Okl.Cr. 1991), *cert. denied*, 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991).

Rogers leave Lauffenburger's apartment near the time of the ATM transactions and before he returned to Todd.

- Todd said Rogers showed her a car like Lauffenburger's and told her he got it from Lauffenburger when he robbed her. Lauffenburger's car was found near Todd's apartment.

- Todd said Rogers did not have money before he left, but had over $200 when he returned. Lauffenburger was robbed of approximately $220.

Several pieces of independent evidence corroborated Todd's testimony regarding the robberies. The jury could have inferred that she spoke the truth as to the whole.

In summary, Todd's testimony was properly corroborated by independent evidence linking Rogers to the commission of the crime. The evidence was sufficient to support the robbery convictions. Rogers argues that, as the evidence was insufficient to support the robbery convictions, the second stage proceedings were prejudiced. We find that there was no error which could prejudice the second stage proceedings.

■■■■ In proposition seven Rogers claims that the evidence was insufficient to sustain his conviction for first degree murder because the State did not establish the trustworthiness of Rogers' admissions by independent evidence. A confession may be considered trustworthy if it is corroborated by substantial independent evidence.[31] The independent evidence must support the essential facts sufficiently to justify the jury's inference of truth.[32] Each material element need not be corroborated by facts independent of the confession and there may be inconsistencies between the facts proven and the facts related in the confession, unless the inconsistencies overwhelm the similarities.[33]

■■■ Rogers' statements regarding meeting Lauffenburger and the State's evidence refuting those statements are contained in the above discussion of sufficiency of the

evidence for rape. In addition, a review of the record shows:

- Rogers claimed he and Lauffenburger went to her apartment to get her ATM card, then went to the bank and withdrew money. This is corroborated by Todd's testimony regarding Rogers' statements to her, the ATM videotape and receipts, and bank records confirming a withdrawal.

- Rogers claimed before intercourse he pulled off his shirt. The eyewitness at the apartment said he saw Rogers wearing a white shirt. Todd also testified that Rogers was wearing a white sleeveless T-shirt (which would pull off). The ATM videotape showed Rogers wearing a white sleeveless collarless pullover shirt.

- Rogers claimed that after intercourse he got a knife from Lauffenburger's kitchen. Todd testified instead that Rogers took her knife from her house when he followed Lauffenburger.

- Rogers claimed as he began to stab Lauffenburger she pulled a pillow over her head, he moved it, and believed it fell to the floor. A bloody pillow with a slash or tear was found next to the body.

- Rogers claimed he stabbed Lauffenburger several times but could not remember what he had done with the knife afterwards. He claimed the stabbing took place in the bedroom. Lauffenburger was found on the floor of the bedroom. She was stabbed nine times in the neck, abdomen and chest, including a long incised wound in the neck. No knife was found. Todd testified Rogers told her he stabbed Lauffenburger so many times the knife broke inside her because she would not die, and that he cut her neck.

- Rogers claimed after he stabbed Lauffenburger he went to the kitchen or bathroom sink and washed and dried his hands. Blood was found in and surrounding the bathroom sink, on towels, and on the door.

- Rogers claimed after the murder he picked up Lauffenburger's car keys, went

31. *Fontenot v. State*, 881 P.2d 69, 80–81 (Okl.Cr. 1994).

32. *Opper v. United States*, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954).

33. *Fontenot*, 881 P.2d at 80–81; *Williamson v. State*, 812 P.2d 384, 400 (Okl.Cr.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992).

downstairs and drove her car to an unfamiliar area; he began walking and realized he was near Todd's apartment. Lauffenburger's apartment was on the second floor. Her car was found near Todd's apartment, and her keys (with her OSU ID card) were found in a field between the apartment and the car. Todd said Rogers showed her the car and told her he got it from Lauffenburger when he robbed her.

- An eyewitness (Walters) saw Rogers leave Lauffenburger's apartment between 7:45 and 8:15, and testified he believed Rogers was directing Lauffenburger down the stairs (he did not see Lauffenburger). This places Rogers at the scene and corroborates either the trip to the ATM or Rogers' final departure.

- Rogers said he went to Todd's apartment to put on a different shirt, then joined Todd at his sister's apartment. Todd said at approximately 8:30 Rogers came to his sister's apartment wearing a white T-shirt with a design and sleeves, different from the shirt he wore when he left her place after the pizza delivery.

Sufficient independent evidence corroborated Rogers' confession to establish its trustworthiness. Taken in the light most favorable to the State, a jury could have found the essential elements of the crime beyond a reasonable doubt.

▮▮▮ Rogers argues in proposition eight that he was prejudiced by the admission of gruesome photographs. The admission of photographs is within the sound discretion of the trial court and will be disturbed on appeal only for an abuse of discretion. Photographs may be admitted if they are relevant and their probative value is not substantially outweighed by their potential for prejudice.[34] State's Exhibits 4F, 4G, 4H, 4I and 4J, admitted over Rogers' objection, are color photographs of Lauffenburger at

the crime scene. Each photograph is from a different angle or distance and depicts different portions of the scene and the wounds. The photographs show only Rogers' handiwork. The pictures are probative of the nature and extent of the wounds and the condition of the crime scene; they corroborate the medical examiner's testimony. Although the photographs are unpleasant, their probative value clearly outweighs any prejudice to Rogers.

## ISSUES RELATING TO PUNISHMENT

In proposition nine Rogers claims that the evidence was insufficient to sustain the jury's finding of aggravating circumstances. Rogers complains solely that first-stage evidence was never incorporated into the second stage, that virtually all the evidence to support the aggravators was presented in the first stage, that the jury was instructed to consider only evidence presented in the second stage, and thus little or no evidence was presented for the aggravating circumstances. A thorough reading of the record indicates that the State clearly incorporated all first stage evidence into the second stage proceedings. The evidence presented at trial was sufficient to support the aggravating circumstances and this proposition is without merit.

▮▮▮ Rogers argues in proposition ten that the "continuing threat" and "especially heinous, atrocious or cruel" aggravating circumstances are unconstitutionally vague and overbroad on their face and as applied. Rogers claims in subproposition A that the continuing threat aggravator as applied is standardless and all-inclusive and that it cannot properly guide the jury. This Court has rejected this claim numerous times.[35] Rogers correctly notes that continuing threat may be proved by prior convictions, unadjudicated crimes, or the circumstances of the

**34.** 12 O.S.1991, § 2403; *Revilla v. State,* 877 P.2d 1143, 1151 (Okl.Cr.1994); *Williamson,* 812 P.2d at 400.

**35.** See, e.g., *Hogan v. State,* 877 P.2d 1157, 1116 (Okl.Cr.1994) (Chapel, J., dissent on issue of unadjudicated crimes to support aggravator); *Snow v. State,* 876 P.2d 291, 298 (Okl.Cr.1994); *Revilla,* 877 P.2d at 1155–56; *Brown,* 871 P.2d at

73; *Ellis,* 867 P.2d at 1301; *Paxton v. State,* 867 P.2d 1309, 1325 (Okl.Cr.1993) (Chapel, J., dissent on issue of unadjudicated crimes to support aggravator); *Trice v. State,* 853 P.2d 203, 220–21 (Okl.Cr.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993); *Pickens v. State,* 850 P.2d 328, 339 (Okl.Cr.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994).

crime for which the defendant is on trial. He cites many cases to support his claim that each of these alone is capable of supporting this aggravator, but in every case he cites several factors supported the aggravator. This Court recently found insufficient evidence of this aggravator where no evidence was presented to support the claim.[36] Here, however, sufficient evidence supported the jury's finding that Rogers would constitute a continuing threat to society.[37]

 Subproposition B challenges the aggravating circumstance that the crime was especially heinous, atrocious or cruel. This Court has consistently upheld this aggravator when the jury is instructed that it is limited to cases involving torture or serious physical abuse.[38] Rogers offers no reason to reconsider these decisions. Rogers is mistaken in supposing this Court has added conscious suffering as a separate element of the aggravator. This Court has held that a victim must be conscious in order to suffer torture or serious physical abuse, but this is not a separate element on which the jury must be instructed.[39] Sufficient evidence supported the jury's finding that Lauffenbur-

ger's murder was especially heinous, atrocious or cruel.[40]

 In proposition eleven Rogers claims that errors in second stage jury instructions denied his rights to due process and reliable sentencing. Rogers raises four common complaints in four subpropositions. This Court has rejected each argument numerous . times. Rogers objected generally to any OUJI instructions on the grounds they were old and did not specifically address this case. He did not object to any specific instructions, including the ones of which he now complains. This Court will thus review only for plain error.

 Rogers complains in subproposition A that the instructions on the manner in which the jury was to weigh aggravating and mitigating circumstances set forth an improper burden of proof. Specific standards for balancing aggravating and mitigating circumstances are not constitutionally required.[41] Whether aggravators outweigh mitigating circumstances is left to the jury's discretion.[42] This Court has consistently rejected this argument, and Rogers gives us no reason to reconsider these decisions.[43]

---

36. *Malone v. State,* 876 P.2d 707, 717 (Okl.Cr. 1994).

37. Rogers was only twenty at the time of these crimes but had been convicted of robbery with firearms in August, 1986, delivery of a forged check after former conviction of a felony in May, 1988, and escape in January, 1989. Rogers had been on parole for five weeks when the murder occurred. The robbery and escape convictions support the jury's finding of the continuing threat aggravating circumstance. Rogers does not claim that evidence of his prior crimes improperly supported both the continuing threat and former conviction of violent felony aggravators; such a claim would fail, as a different facet of the evidence was required for each aggravator. *Pickens v. State,* 850 P.2d at 336.

38. See, e.g., *Stouffer v. State,* 742 P.2d 562, 563 (Okl.Cr.1987) (Opinion on Rehearing), *cert. denied* 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988); *Hooks v. State,* 862 P.2d 1273, 1282 (Okl.Cr.1993); *Clayton v. State,* 840 P.2d 18, 31 (Okl.Cr.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1655, -123 L.Ed.2d 275 (1993); *Stafford v. State,* 832 P.2d 20, 23 (Okl.Cr.1992); *Rojem v. State,* 753 P.2d 359, 369 (Okl.Cr.1988), *cert. de-*

*nied,* 488 U.S. 900, 109 S.Ct. 249, 102 L.Ed.2d 238 (1988).

39. *Battenfield v. State,* 816 P.2d 555, 565 (Okl.Cr. 1991), *cert. denied,* — U.S. —, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992).

40. Rogers followed Lauffenburger from Todd's apartment at approximately 7:00 p.m., went with her to the ATM at approximately 7:50 p.m., and returned to his sister's around 8:30. Lauffenburger was raped with vaginal injuries that would have bled, been painful, and required treatment had she lived. She had bruising on her mouth and defensive wounds on her hands. Although she was stabbed nine times, only two of those wounds were fatal. Rogers told police she pulled a pillow over her head to prevent him from stabbing her.

41. *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

42. *Johnson v. State,* 731 P.2d at 1004.

43. See, e.g., *Malone,* 876 P.2d at 715; *Revilla,* 877 P.2d at 1153; *Ellis v. State,* 867 P.2d 1289, 1301 (Okl.Cr.1994); *Trice,* 853 P.2d at 216; *Woodruff,* 846 P.2d at 1149.

In subproposition C Rogers argues that the trial court erred in failing to instruct the jury it had the option to return a life sentence regardless of its findings on aggravating and mitigating circumstances. A life sentence may be given notwithstanding a jury finding of aggravating circumstances which outweigh mitigating circumstances, but an instruction on this point is not required.[44] Rogers did not request such an instruction, and the jury instructions given accurately stated the law.[45] This Court has consistently rejected this argument, and Rogers provides no grounds to reconsider these decisions.[46]

In subpropositions B and D Rogers complains of the instructions on mitigating evidence. Rogers has confused the cases normally cited for two common arguments. Subproposition B charges that the instructions on mitigating evidence permitted jurors to ignore mitigating evidence altogether and diminished the effect of his mitigating evidence; subproposition D claims that the instructions taken together imply the jury findings regarding mitigating circumstances must be unanimous, and the jury should have been instructed that its findings did not have to be unanimous. Instruction 54 told the jury mitigating circumstances are those which "may be" considered as extenuating or reducing the degree of moral culpability or blame. Rogers complains that this language allowed the jury to ignore both circumstances listed in Instruction 55 and any other circumstances they might otherwise have found from the evidence. On the contrary, "may be" reflects the correct constitutional standard; any mandatory language would infringe on the jury's duty to determine individual punishment. This Court has consistently rejected this argument.[47] Oklahoma law does not require a unanimous finding of mitigating circumstances, which would be unconstitutional.[48] This Court has consistently rejected any argument suggesting that jurors should be instructed otherwise.[49]

A review of the instructions at issue in proposition eleven reveals no error which denied Rogers a constitutional or statutory right or went to the foundation of the case.[50]

## MANDATORY SENTENCE REVIEW

In accordance with 21 O.S.Supp. 1985, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether

---

**44.** *Parks v. State,* 651 P.2d 686 (Okl.Cr.1982), cert. denied, 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983).

**45.** Instruction 54 told the jury they must impose a noncapital sentence if they had a reasonable doubt about Rogers' guilt as to the Bill of Particulars. Instruction 53 authorized the jury to consider imposing the death penalty upon a unanimous finding of one or more aggravating circumstances beyond a reasonable doubt.

**46.** See, e.g., *Malone,* 876 P.2d at 714–715; *Allen v. State,* 871 P.2d 79, 102 (Okl.Cr.1994); *Brown v. State,* 871 P.2d 56, 73 (Okl.Cr.1994); *Robedeaux v. State,* 866 P.2d 417, 435 (Okl.Cr.1993); *Pickens,* 850 P.2d at 339; *Fisher v. State,* 845 P.2d 1272, 1278 (Okl.Cr.1992), cert. denied — U.S. ——, 113 S.Ct. 3014, 125 L.Ed.2d 704 (1993).

**47.** *Pickens,* 850 P.2d at 339–340; *Revilla,* 877 P.2d at 1154; *Brown v. State,* 871 P.2d at 74; *Williamson,* 812 P.2d at 400.

**48.** See *McKoy v. North Carolina,* 494 U.S. 433, 437–41, 110 S.Ct. 1227, 1231–32, 108 L.Ed.2d 369 (1990).

**49.** *Pickens v. State,* 850 P.2d at 339–40; *Woodruff v. State,* 846 P.2d at 1148–49; *Castro v. State,* 844 P.2d 159, 176 (Okl.Cr.1992), cert. denied, — U.S. ——, 114 S.Ct. 135, 126 L.Ed.2d 98 (1993); *Clayton,* 840 P.2d at 34.

Rogers argues that this instruction was sandwiched into the instructions for aggravating circumstances, all of which required unanimity. The record reveals that Instructions 48–52 do not touch on unanimity requirements; Instruction 53 defines aggravating circumstances and requires unanimity; Instruction 54 defines mitigating circumstances and does not discuss unanimity; Instruction 55 lists specific mitigating circumstances and does not discuss unanimity; Instruction 56 requires the jury to unanimously find at least one aggravator then unanimously find that it outweighs any mitigator before imposing the death penalty; Instruction 57 requires jurors to unanimously find an aggravator and reduce that finding to writing, but does not require written or unanimous findings of any mitigators. The distinctions between aggravating factors and mitigating circumstances are clear and unambiguous.

**50.** *Fontenot,* 881 P.2d at 85; 20 O.S.1991, § 3001.1.

the evidence supports the jury's finding of aggravating circumstances.

Upon review of the record, we cannot say the sentence of death was imposed because the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.Supp.1987, § 701.13(C).

The jury was instructed on and found the existence of three aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel; (2) there was a probability that Rogers would commit criminal acts of violence that would constitute a continuing threat to society; and (3) Rogers had previously been convicted of a felony involving violence. Upon our review of the record, we find the sentence of death to be factually substantiated and appropriate.

Finding no error warranting modification, the judgments and sentences of the District Court of Payne County are **AFFIRMED.**

JOHNSON, P.J., and LANE and STRUBHAR, JJ., concur.

LUMPKIN, J., concur in result.

LUMPKIN, Judge: Concur in results.

I concur in the Court's decision to affirm the judgment and sentence in this case. However, I disagree with the Court's conclusion that the principles enunciated in *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), concerning state funded psychiatric expert witnesses, have been extended to any expert necessary for an adequate defense. See *Hawkins v. State,* —— P.2d ——, ——, 66 OBJ 31, 37 (Okl.Cr.1995). The cases cited in the opinion in support of the Court's conclusion have not extended *Ake* to any expert other than a psychiatric expert. In addition, the cases are limited in application as cases wherein the defendant did not make the requisite showing of need for an expert.

As a result of need for guidelines for the compensation of expert witnesses after the *Ake* decision, the Legislature enacted 22 O.S.Supp.1985, § 464(B). This section limited the expenditure of state funds for expert witnesses to cases wherein the death penalty was a possible sentence, the defendant made a showing of financial need and the requested expert was necessary to the defense. Section 464(B) provides in pertinent part:

B. When a person is charged with a criminal offense where such person faces the possibility of a death sentence, the court may, upon application of the defendant demonstrating that an expert witness is necessary to prepare the defense and that the defendant is financially unable to pay for such services, provide access to such witnesses and other services as are reasonably necessary to permit the defendant to adequately prepare for trial and at any subsequent proceeding by authorizing counsel to obtain such services. The court will rule on the reasonableness of the request for expert witnesses and other services by the defendant....

Thus, it is Section 464 which sets the criteria for the appointment of an expert and is limited to a "person charged with a criminal offense where such person faces the possibility of a death sentence".

However, it now appears the above comments are relevant only in an evaluation of the historical perspective relating to *Ake.* This statute was repealed in 1991 when the Indigent Defense System was reorganized. See 22 O.S.1991, § 1355.4. Recent amendments to that act have made the above discussion merely an academic exercise. The Legislature's amendment of The Indigent Defense Act, 1994 Okla.Sess.Laws Ch. 328 § 3(D), places the decision to fund any defense expert witness with the Executive Director of the Oklahoma Indigent Defense System. This provision provides:

When an attorney has been appointed in accordance with the Indigent Defense Act, in any county, and needs investigative, expert or other services, a request for compensation for such services shall be made to the Executive Director on a form provided by the Executive Director. The Executive Director may authorize compensation at a reasonable hourly rate, subject to funds budgeted and available to the Oklahoma Indigent Defense System.

This amendment, together with other statutory changes, appears to properly place the funding for all aspects of indigent defense in

the Executive Department rather than continuing to drain the resources of the Judicial Department through the Court Fund of the district courts.

### ORDER DENYING PETITION FOR REHEARING AND DIRECTING ISSUANCE OF MANDATE

Kelly Lamont Rogers was tried by jury before the Honorable Donald L. Worthington in the District Court of Payne County. In Case No. CRF–412 he was convicted of First Degree Malice Aforethought Murder in violation of 21 O.S.1991, § 701.7; he was convicted of First Degree Robbery, 21 O.S.1991, § 801, in CRF–91–26 and CRF–91–27; First Degree Rape, 21 O.S.1991, §§ 1111, 1114, in CRF–91–28; and Larceny of a Motor Vehicle, 21 O.S.1991, § 1720, in CRF–91–29, all after conviction of two or more felonies. The jury found 1) the murder was especially heinous, atrocious, or cruel; 2) there was a probability that Rogers would commit criminal acts of violence that would constitute a continuing threat to society; and 3) Rogers had previously been convicted of a felony involving violence. Rogers was sentenced to death for the murder conviction, fifty years and seventy-five years for each robbery charge respectively, one hundred fifty years for rape, and fifty years incarceration for larceny.

By its January 24, 1995, published opinion, this Court affirmed Rogers' convictions and sentences. Rogers is now before the Court on a Petition for Rehearing, Rule 3.14, *Rules of the Court of Criminal Appeals,* 22 O.S.Supp.1993, Ch. 18, App. According to Rule 3.14, a Petition for Rehearing shall be filed for two reasons only:

(1) That some question decisive of the case and duly submitted by the attorney of record has been overlooked by the Court, or

(2) That the decision is in conflict with an express statute or controlling decision to which the attention of this Court was not called either in the brief or in oral argument.

Rogers raises one proposition in his Petition for Rehearing which fails to meet the criteria set forth in Rule 3.14. Accordingly, this proposition will not be addressed.

**IT IS THEREFORE THE ORDER OF THE COURT** that the Petition for Rehearing is **DENIED.** The Clerk of the Court is directed to issue the mandate forthwith.

IT IS SO ORDERED.

**WITNESS OUR HANDS AND THE SEAL OF THIS COURT** this <u>8th</u> day of <u>March</u>, 1995.

/s/ Charles A. Johnson
CHARLES A. JOHNSON,
Presiding Judge

/s/ Charles S. Chapel
CHARLES S. CHAPEL,
Vice–Presiding Judge

/s/ Gary L. Lumpkin
GARY L. LUMPKIN,
Judge

/s/ James F. Lane
JAMES F. LANE,
Judge

/s/ Reta M. Strubhar
RETA M. STRUBHAR,
Judge